## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEFFREY SCHREIBER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,<br><br>Defendant. | Case No. 2:22-cv-00188-HYJ-RSK<br><br>Hon. Hala Y. Jarbou<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Schreiber ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.       Defendant Mayo Foundation for Medical Education and Research ("MFMER") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *Mayo Clinic Health Letter* healthletter subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, political

organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading Information (defined below) during the relevant pre-July 31, 2016 time period[1], MFMER violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

---

[1]    The statutory period for this action is six years, which is 2,190 days. *See* M.C.L. § 600.5813.

    The applicable six-year limitation period was tolled for 101 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, <u>including but not limited to any deadline for filing an initial pleading</u> . . . are suspended as of March 10, 2020 <u>and shall be tolled</u> until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, <u>including but not limited to the deadline for the initial filing of a pleading</u> . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

    Thus, the applicable statutory period for this action is June 18, 2016 (2,291 days prior to the commencement of the instant action on September 26, 2022) through July 30, 2016.

[2]    In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*).

2.      Documented evidence confirms these facts.  For example, MFMER, through list broker NextMark, Inc. ("NextMark"), offers to provide renters access to the mailing list titled "MAYO CLINIC HEALTH LETTER Mailing List", which contains the Private Reading Information of all 449,162 of MFMER's active and recently expired U.S. subscribers at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the screenshot below:

---

The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date.  *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)).  Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).



*See* **Exhibit A** hereto.

3.     The same or a substantially similar "data card" as the one shown above, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, has been publicly advertised by MFMER since as far back as 2005 and was publicly advertised by MFMER on a continuous basis between 2005 and the present, including throughout

the entire pre-July 31, 2016 time period – thus demonstrating that MFMER was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.

4.      For instance, an archived copy of MFMER's data card was cached by the Wayback Machine Internet Archive (archive.org) on November 23, 2006, reflecting that MFMER was offering to provide renters access to the mailing list titled "MAYO CLINIC HEALTH LETTER", which contained the Private Reading Information of all 591,801 of MFMER's then active and recently expired U.S. subscribers to *Mayo Clinic Health Letter* at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the screenshot below:



**MAYO CLINIC HEALTH LETTER**

Get More Information     Place Order

| SEGMENTS | | COUNTS THROUGH 10/31/2006 |
|---|---|---|
| | TOTAL UNIVERSE / BASE RATE | $0.00/M |
| 591,801 | ACTIVE U.S. SUBSCRIBERS | $105.00/M |
| 104,722 | OCTOBER HOTLINE | + $10.00/M |
| 205,653 | QUARTERLY HOTLINE | + $5.00/M |
| 271,239 | 12 MONTH COA | + $10.00/M |
| 354,204 | 12 MONTH EXPIRES | $75.00/M |
| | INQUIRE FOR FUNDRAISER, NONPROFIT, & CATALOG SPECIAL RATES | |
| | | |
| | | |

**DMA** Direct Marketing Association
Member

POPULARITY: ▪▪▪▪▪ 100
MARKET: CONSUMER
MEDIUM: mail
SOURCE: DIRECT MAIL SOLD
GEO: DOMESTIC (US)
GENDER: 40% FEMALE 60% MALE
INCOME:
SPENDING: $27.00 AVERAGE ORDER

**DESCRIPTION**

*Put the resources of the Mayo Clinic to work for you!* Mayo Clinic Newsletters are backed by a century of patient care, medical research and experience at one of the world's foremost medical centers.

Mayo Clinic Women's HealthSource delivers the information women need to take control of their health and their lives.

- Groundbreaking medical developments

- Stress checks

- Weight control

- Mind, body, and fitness

- Interviews with reknowned Mayo physicians

*Try these selects now available for the first time!*

**Age:**          **Income:**

| SELECTS | |
|---|---|
| AGE | $10.00/M |
| GENDER/SEX | $6.00/M |
| INCOME SELECT | $10.00/M |
| KEYING | $2.00/M |
| LIFESTYLE SELECT | $10.00/M |
| MULTIBUYERS | $6.00/M |
| RUNNING CHARGES | $8.00/M |
| SCF | $6.00/M |
| STATE | $6.00/M |
| ZIP | $10.00/M |
| ZIP SET UP FEE | $50.00/F |
| ZIP+4 | $3.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| CARTRIDGE | $30.00/F |
| DISKETTE | $50.00/F |
| EMAIL | $50.00/F |
| SECURE FTP | $50.00/F |

| MANAGER ID: | |
|---|---|
| NEXTMARK ID: | 153566 |
| MARKET ENTRY: | |
| NEW TO SYSTEM: | 11/16/2004 |

*See* **Exhibit B** hereto (available at https://web.archive.org/web/20061123185743/ https://lists.nextmark.com/market?page=order/online/datacard&id=153566).

5.     One third party with whom MFMER regularly and systematically disclosed its customers' Personal Reading Information during the relevant pre-July 31, 2016 time period was RMI Direct Marketing ("RMI"), for both list rental

brokerage and data enhancement services. Indeed, an archived copy of an RMI webpage that was cached by the Wayback Machine Internet Archive (archive.org) on February 12, 2018, states that MFMER has been "[a]n RMI client since 2005," and indicates that, between 2005 and 2018, RMI managed MFMER's "datacards" and brokered list rentals, "[i]ncreased [MFMER's] multichannel marketing efforts", "increase[d] tests on [MFMER's] mature list rental file," and, through its list rental efforts on MFMER's behalf, was overall "able to provide greater value per name [on MFMER's subscriber list] for Mayo Clinic year over year." *See* RMI Direct Marketing, "Case Studies: Offsetting Lost Revenue After a Publication Title Closes," version in effect on Feb. 12, 2018, available in archived form at https://web.archive.org/web/20180213220511/http://www.rmidirect.com/insights/case-studies/mayo-clinic-newsletter-and-book-buyers/, a copy of which is attached hereto as **Exhibit C**, at 2-4.

6. The cached RMI webpage attached hereto as **Exhibit C** also indicates that RMI also added "four . . . datacards" to the marketplace for MFMER, which RMI had "enhanced" on MFMER's behalf – i.e., appended additional information about each of MFMER's customers to enhance the value of their Personal Reading Information, enabling MFMER to then sell, rent, exchange, and otherwise disclose this information to third party renters and others for more money. Indeed, RMI's clients, such as MFMER, use these services, and used these services during the

relevant pre-July 31, 2016 time period, by transmitting their entire subscriber files to RMI, who in turn "appends" additional demographic and personal data about each subscriber to the file, thereby "enhancing" it (i.e., making it more valuable, and allowing the publisher to rent its lists to third parties for more money and to exchange its lists to other third parties on more favorable terms), and also provides the publisher client with the Personal Reading Information of other individuals who are not existing subscribers to its publications but who fit certain pre-determined criteria that render them likely to be interested in purchasing subscriptions to its publications, i.e., "prospects" who the publisher then markets its publications to. Plaintiff is informed and believes, and thereupon alleges, that, throughout the relevant pre-July 31, 2016 time period, MFMER (as a data "enhancement" and "prospecting" client of RMI's) was contractually obligated to provide RMI the Personal Reading Information of all of the subscribers (as well as all of the recently expired subscribers) to its *Mayo Clinic Health Letter* publication, on a periodic and regular basis (at least as frequently as once a month), which RMI then used to facilitate its list enhancement and prospecting services. Thus, because MFMER was a client of RMI's throughout the relevant pre-July 31, 2016 time period (*see* **Ex. C**), MFMER necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to RMI on at least as frequently as a monthly basis over the same time period.

7.      Indeed, on the current version of RMI's website, on a webpage that was first published on January 24, 2014 and has remained live ever since then, RMI advertises the availability of various MFMER customer lists for rental and exchange, including "Mayo Clinic Enhanced," a list comprised of the Personal Reading Information of approximately "659,000 subscribers" to *Mayo Clinic Health Letter*, "overlaid with rich data, offering hundreds of behavioral, purchase, and demographic variables."  RMI Direct Marketing, "List Kits: Overview of Mayo Clinic List Properties," Jan. 24, 2014, available at http://www.rmidirect.com/kits/mayo/newsroom-microsite/overview-mayo-clinic/ (last accessed Jan. 3, 2023), a copy of which is attached hereto as **Exhibit D**, at 2.

8.      Moreover, in MFMER's "Privacy Policy" in effect on July 10, 2016 and throughout the relevant pre-July 31, 2016 time period, which was accessible via hyperlink at the bottom of its *Mayo Clinic Health Letter* magazine website (but which was not presented in any manner to the customer at the time he or she purchased a subscription), MFMER admitted that it discloses all of its subscribers' Personal Reading Information to third parties, including by "stor[ing]" its customers' "personal information" with "a third party vendor," and by "regularly shar[ing] our postal mailing list with other organizations offering products and services that may be of interest to our customers."  Mayo Clinic Health Letter, "Privacy Policy," version in effect on July 10, 2016, available in archived form at

https://web.archive.org/web/20160710155258/http://healthletter.mayoclinic.com:8
0/privacy.cfm, a copy of which is attached hereto as **Exhibit E**, at 1.

9. The lists advertised for sale in the "data cards" referenced in paragraphs 2 and 4 above (and all of the other "data cards" advertised by MFMER between the commencement of the relevant pre-July 31, 2016 time period and the present) included, *inter alia*, the full names and addresses of each person who purchased a subscription to MFMER's publications, including *Mayo Clinic Health Letter*; indeed, the postal-mail envelope logo in the "medium" or "channels" field of the data card (which appeared on all of the data cards referenced herein) indicates that the advertised mailing list contains the necessary information (i.e., name and address) for the renters, exchangers, and purchasers of the list to contact the subscribers whose information appears on it via postal mail. And the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from MFMER prior to being disclosed to the renters, purchasers, and exchangers of this data; indeed, this is indicated by the "direct mail sold" text in the "source" field of the data cards.

10. Thus, for the entire duration of the pre-July 31, 2016 time period, MFMER was continuously and systematically (at least as frequently as once a month) renting, selling, exchanging, and otherwise disclosing all of its customers'

Private Reading Information (including Plaintiff's and all Class members' Private Reading Information) to numerous other third parties for appending, enhancement, prospecting, and rental purposes.

11.     As a result of MFMER's practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Mayo Clinic Health Letter* over the same time period.

12.     By renting, exchanging, or otherwise disclosing the Private Reading Information of all of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, MFMER violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

13.     Accordingly, Plaintiff brings this First Amended Class Action Complaint against MFMER for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

## NATURE OF THE CASE

14.　　To supplement its revenues, MFMER rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers. MFMER continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period.

15.　　By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, MFMER is able to disclose the information time and time again to countless third parties.

16.　　MFMER's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

17.　　While MFMER profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory

privacy rights (afforded by the PPPA) because MFMER does not obtain its customers' written consent prior to disclosing their Private Reading Information.

## PARTIES

18.     Plaintiff Jeffrey Schreiber is a natural person and citizen of the State of Michigan and resides in Chassell, Michigan.  Plaintiff was a subscriber to *Mayo Clinic Health Letter* healthletter, including prior to July 31, 2016.  *Mayo Clinic Health Letter* healthletter is published by MFMER.  While residing in, a citizen of, and present in Michigan, Plaintiff purchased his subscription to *Mayo Clinic Health Letter* healthletter directly from MFMER.  Prior to and at the time Plaintiff subscribed to *Mayo Clinic Health Letter*, MFMER did not notify Plaintiff that it discloses the Private Reading Information of its customers, and Plaintiff has never authorized MFMER to do so.  Furthermore, Plaintiff was never provided any written notice that MFMER rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out.  Since subscribing to *Mayo Clinic Health Letter*, and during the relevant pre-July 31, 2016 time period, MFMER disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files.  Moreover, during that same period, MFMER rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact MFMER subscribers,

without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

19.     Defendant Mayo Foundation for Medical Education and Research is a Minnesota corporation with its headquarters and principal place of business in Rochester, Minnesota.  MFMER does business throughout Michigan and the entire United States. MFMER is the publisher of various medical books and other publications, including but not limited to *Mayo Clinic Health Letter*.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

21.     The Court has personal jurisdiction over MFMER because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Mayo Clinic Health Letter* subscription in Michigan, MFMER's direction of such *Mayo Clinic Health Letter* subscription into Michigan, and MFMER's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by

14

a citizen and resident of Michigan. Personal jurisdiction also exists over MFMER in Michigan because MFMER conducts substantial business within Michigan, such that MFMER has significant, continuous, and pervasive contacts with the State of Michigan.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, MFMER does substantial business in this judicial District, MFMER is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

23.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

24.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the

purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

25.    Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

26.    Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

27.    As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the

selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

28.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

29.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit F**).

30.     Despite the fact that thousands of Michigan residents subscribe to MFMER's publications, MFMER disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market: Consumers' Private Information Has Real Value

31.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything

we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

32.    More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

33.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[5]

34.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about

---

[3]    **Exhibit G**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[4]    *See* **Exhibit H**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[5]    **Exhibit I**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

35. The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

36. Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

37. Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies

---

[6]    *See* **Exhibit J**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[7]    **Exhibit K**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[8]    **Exhibit L**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

seeking information on how those companies collect, store, and sell their massive collections of consumer data.[9]

38.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[10]

39.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[11] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like MFMER share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of

---

[9]     *See* **Exhibit M**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[10]     *Id.*

[11]     *See* **Exhibit N**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

fraudulent telemarketers" and other criminals.[12]

40. Information disclosures like those made by MFMER are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[13] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[14] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

41. Thus, information disclosures like MFMER's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers

---

[12] **Exhibit O**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[13] *Id.*

[14] **Exhibit P**, *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (Aug. 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 30, 2021).

21

from a host of scam artists."[15]

42.     MFMER is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

43.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

44.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

45.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[16]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps

---

[15]     *See id.*

[16]     *See* **Exhibit Q**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

that they don't believe protect their privacy online.[17]

46. Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

47. In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[18]

48. These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[19]

---

[17] *Id.*

[18] *See* **Exhibit R**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[19] *See* **Exhibit S**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), discussed in European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at*

49.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[20]

### *MFMER Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading Information*

50.     MFMER maintains a vast digital database comprised of its customers' Private Reading Information.  MFMER discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each MFMER customer, including his or her gender.  (*See, e.g.*, **Exhibit A**).

51.     MFMER then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular healthletters, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

---

https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[20]     *See* **Exhibit T**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

52.     MFMER also discloses its customers' Private Reading Information to data cooperatives, who in turn give MFMER access to their own mailing list databases.

53.     As a result of MFMER's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from MFMER that identify MFMER's customers by their most intimate details such as their gender.  MFMER's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

54.     MFMER does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

55.     During the relevant pre-July 31, 2016 time period, consumers purchased subscriptions to MFMER's publications through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribed, MFMER never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, MFMER uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their

Private Reading Information.

56.     As a result, MFMER disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[21] – to anybody willing to pay for it.

57.     By and through these actions, MFMER has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by MFMER without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

59.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class

---

[21]     **Exhibit U**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

60. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether MFMER is a "retailer or distributor" of publications (*i.e.*, healthletters); (b) whether MFMER obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading Information; and (c) whether MFMER's disclosure of Plaintiff's and the Class's Private Reading Information violated the PPPA.

61. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading Information.

62. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

63. The class mechanism is superior to other available means for the fair

and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

64.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

65.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant MFMER.

66.    As a healthletter publisher that sells subscriptions to consumers, MFMER is engaged in the business of selling written materials at retail. *See* PPPA

§ 2.

67.     By purchasing a subscription to *Mayo Clinic Health Letter* healthletter, Plaintiff purchased written materials directly from MFMER. *See* PPPA § 2.

68.     Because Plaintiff purchased written materials directly from MFMER, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

69.     At various times during the pre-July 31, 2016 time period, MFMER disclosed Plaintiff's Private Reading Information, which identified him as a *Mayo Clinic Health Letter* customer, in at least three ways.

70.     First, MFMER disclosed mailing lists containing Plaintiff's Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to MFMER.

71.     Second, MFMER disclosed mailing lists containing Plaintiff's Private Reading Information to data cooperatives, who in turn gave MFMER access to their own mailing list databases.

72.     Third, MFMER rented and/or exchanged its mailing lists containing Plaintiff's Private Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

73. Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and MFMER was able to increase its profits gained from the mailing list rentals and/or exchanges.

74. By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, MFMER disclosed to persons other than Plaintiff records or information concerning his purchase of written materials from MFMER. *See* PPPA § 2.

75. The information MFMER disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed to *Mayo Clinic Health Letter*. Accordingly, the records or information disclosed by MFMER indicated Plaintiff's identity. *See* PPPA § 2.

76. Plaintiff and the members of the Class never consented to MFMER disclosing their Private Reading Information to anyone.

77. Worse yet, Plaintiff and the members of the Class did not receive notice before MFMER disclosed their Private Reading Information to third parties.

78. MFMER's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

79. MFMER's disclosures of Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to

collect payment for their subscriptions.

80. MFMER's disclosures of Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase MFMER's revenue. Accordingly, MFMER's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

81. By disclosing Plaintiff's and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, MFMER violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

82. As a result of MFMER's unlawful disclosure of their Private Reading Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 to Plaintiff and each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.  For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.  For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.  For prejudgment interest on all amounts awarded; and

F.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: January 3, 2023             Respectfully submitted,

**JEFFREY SCHREIBER**,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300

Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com