UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEFFREY SCHREIBER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,<br><br>Defendant. | Case No. 2:22-cv-00188-HYJ-RSK<br>Hon. Hala Y. Jarbou<br><br>**DEFENDANT MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH'S BRIEF IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

I. The Parties ................................................................................................... 1

II. Relevant Limitations Period ........................................................................ 2

III. Mr. Schreiber's Allegations. ....................................................................... 3

LEGAL STANDARD ................................................................................................ 7

ARGUMENT ............................................................................................................. 8

I. The Complaint Must Be Dismissed Because It Does Not State A Claim For Violation Of The PPPA Against Mayo That Is Plausible On Its Face. ............................................................................................................. 8

    A. Mr. Schreiber Has Not Plausibly Alleged that Mayo Disclosed Protected Information during the Relevant Time Period. ............. 9

    B. Mr. Schreiber Has Not Plausibly Alleged the Disclosure of His Information ............................................................................... 15

CONCLUSION ........................................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................... 7, 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ............................................................................................... 7, 8

*Davis v. Hartford Life & Accident Ins. Co.*,
   980 F.3d 541 (6th Cir. 2020) ..................................................................................... 8

*Krassick v. Archaeological Institute of America*,
   No. 2:21-cv-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022) ............................... 3

*League of United Latin Am. Citizens v. Bredesen*,
   500 F.3d 523 (6th Cir. 2007) ..................................................................................... 8

*Lindke v. Tomlinson*,
   31 F.4th 487 (6th Cir. 2022) ...................................................................................... 8

*Nashel v. New York Times Co.*,
   No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) ................ *passim*

*Wheaton v. Apple Inc.*,
   No. C 19-02883, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) ................................ 11

**Statutes**

Mich. Comp. Laws § 445.1712 (1989) ............................................................... 8, 9, 15

Mich. Comp. Laws § 445.1715 (1989) ........................................................................ 2

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6) .................................................... 7, 11

## INTRODUCTION

Plaintiff's original Complaint was filed with boilerplate allegations under Michigan's Preservation of Personal Privacy Act ("PPPA") in an effort to exploit a narrow extension of the statute of limitations created by COVID tolling orders. After Defendant Mayo Foundation for Medical Education and Research ("Mayo") moved to dismiss, Plaintiff Jeffrey Schreiber filed an amended Complaint purporting to bolster his allegations. The new allegations, however, are substantially the same as allegations already addressed and rejected by Judge Stephen J. Murphy, III of the Eastern District of Michigan, *see Nashel v. New York Times Co.*, No. 2:22-CV-10633, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022). Because Plaintiff's Amended Complaint contains substantially similar allegations as the *Nashel* complaint, which did not cure the same "gaping omissions" present in that case, this Court should follow Judge Murphy's reasoning and dismiss Mr. Schreiber's Amended Complaint in its entirety.

## BACKGROUND

### I. THE PARTIES.

As alleged in the First Amended Class Action Complaint (FAC), Plaintiff Jeffrey Schreiber is a citizen of Michigan. (Dkt. 19, FAC ¶ 18.)

Mayo Foundation for Medical Education and Research ("Mayo") is a Minnesota nonprofit corporation with its principal place of business in Rochester, Minnesota. (*Id.* ¶ 19.) The Complaint alleges that Mayo is the publisher of *Mayo Clinic Health Letter*. (*Id.*)

## II. RELEVANT LIMITATIONS PERIOD.

Mr. Schreiber brings this action under a since-amended version of the PPPA, which was in effect until July 31, 2016. (FAC ¶ 1 n.1-2.) Under the old version of the PPPA, a plaintiff may recover the greater of actual damages or $5,000 in statutory damages. Mich. Comp. Laws § 445.1715 (1989). After Mr. Schreiber's attorneys and others filed numerous putative class action lawsuits asserting statutory damages under the act, the Michigan Legislature amended the PPPA in 2016 to cure and clarify the statute. *See* 2016 Mich. Pub. Acts No. 92 (codified at Mich. Comp. Laws § 445.1711-.1715) (noting that the amendment is "curative and intended to clarify" the act). This amendment removed the $5,000 in statutory damages, and limited recovery to actual damages only. *Id.*; *see also* Mich. Comp. Laws § 445.1715(2). The amended version of the statute took effect on July 31, 2016. *See* 2016 Mich. Pub. Acts No. 92.

Mr. Schreiber alleges claims based exclusively on the pre-amendment version of the PPPA, during what he terms the "relevant pre-July 31, 2016 time period." (FAC ¶ 1.) He also seeks to represent a class of "all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by [Mayo] without consent." (*Id.* ¶ 58.)

The "relevant pre-July 31, 2016 time period" is defined as the six-year statutory period for this action, plus the time period in which claims were tolled as a result of COVID Executive Orders, until July 31, 2016. (*Id.* ¶ 1 n.1-2.) Because July 30, 2016 is the last

day on which the pre-amendment version of the statute applied, the relevant time period is June 17, 2016 through July 30, 2016.[1] *See* 2016 Mich. Pub. Acts No. 92.

### III. MR. SCHREIBER'S ALLEGATIONS.

Mr. Schreiber's original Complaint contained nearly identical allegations as the other Complaints filed by his counsel against other defendants on behalf of different individuals. In sweeping fashion, he alleged that Mayo "rented, exchanged, and/or otherwise disclosed detailed information" about his "Private Reading Information" to unidentified "data aggregators, data appenders, data cooperatives, and list brokers" without consent or notice, and those third parties then "disclosed his information to aggressive advertisers, political organizations, and non-profit companies" in violation of the PPPA. (Dkt. 1, Compl. ¶¶ 1, 2, 10.) While Mr. Schreiber alleged that there is "[d]ocumented evidence confirm[ing] these facts," the only "documented evidence" was Exhibit A, a single screenshot from a "list broker" named NextMark, Inc., allegedly "offer[ing] to provide renters access to the mailing list titled 'MAYO CLINIC HEALTH LETTER Mailing List'" regarding "active and recently expired U.S. subscribers" with "counts through 7/19/2022"—six years <u>after</u> the relevant time period. (Compl. ¶ 2 and Ex. A.) Exhibit A did not reflect the source of the information allegedly available, how NextMark obtained the information, or the individuals whose information is advertised. Indeed, the

---

[1] Mayo recognizes that, in *Krassick v. Archaeological Institute of America*, No. 2:21-cv-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022), this Court held that PPPA claims are subject to a six-year statute of limitations. Accordingly, Mayo does not move to dismiss the Complaint based on statute of limitations grounds. However, Mayo disputes whether the claim is timely and reserves the defense and all arguments that Plaintiff's claims are untimely should the matter proceed past the motion to dismiss stage.

Complaint did not allege any facts connecting the data allegedly advertised (by third parties or Mayo) to a sale or disclosure of data by Mayo. With respect to the alleged sale of Mr. Schreiber's data, the Complaint alleged that at some unidentified time prior to July 31, 2016, Mr. Schreiber was a subscriber to *Mayo Clinic Health Letter*. (*Id.* ¶ 10.) It did not allege when he was a subscriber, when he claims his data was sold by Mayo in violation of the statute, or who it was sold to. The only harm he alleged is that as a result of the alleged disclosures "during the relevant pre-July 31, 2016 time period, [he] saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Mayo Clinic Health Letter* over the same time period." (*Id.* ¶ 3.)

Because the original Complaint contained glaring omissions with respect to time and causation, and consistent with Judge Murphy's decision in the *Nashel* case, Mayo moved to dismiss. In lieu of responding to that motion, and in an apparent acknowledgement of the deficiencies in the original Complaint, Mr. Schreiber filed an Amended Complaint.

Like the original Complaint, the Amended Complaint alleges that Mayo "rented, exchanged, and/or otherwise disclosed detailed information" about Mr. Schreiber's "Private Reading Information" to unidentified "data aggregators, data appenders, data cooperatives, and list brokers" without consent or notice, and those third parties then "disclosed his information to aggressive advertisers, political organizations, and non-profit companies" in violation of the PPPA. (Dkt. 19, FAC ¶¶ 1, 2, 18.) Like the original Complaint, the FAC asserts that there is "[d]ocumented evidence confirm[ing] these facts." (Compl. ¶ 2.) However, the "documented evidence" does no such thing.

First, the FAC cites to screenshots of two "data cards." Exhibit A is the same as the original Complaint—a single undated screenshot from a "list broker" named NextMark, Inc., allegedly "offer[ing] to provide renters access to the mailing list titled 'MAYO CLINIC HEALTH LETTER Mailing List'" of information regarding "active and recently expired U.S. subscribers" with "counts through 7/19/2022"—six years <u>after</u> the relevant time period. (FAC ¶ 2.) The FAC adds Exhibit B—an "archived copy of [Mayo's] data card . . . cached by the Wayback Machine Internet Archive (archive.org) on November 23, 2006"—purporting to reflect information from ten years <u>before</u> the relevant 2016 time period. (*Id.* ¶ 4 and Ex. B.) The FAC then alleges in a conclusory fashion that the "same or substantially similar" data card as Exhibit A was publicly advertised on a continuous basis between 2005 and the present. (*Id.* ¶ 3.) Beyond the obvious timing issue, Exhibits A and B also do not reflect the source of the information allegedly available,[2] how NextMark obtained the information, or the individuals whose information is advertised.

Second, the FAC makes various allegations regarding a relationship between Mayo and RMI Direct Marketing ("RMI"). (FAC ¶ 5.) Specifically, it attaches Exhibit C, an archived copy of an RMI webpage "cached by the Wayback Machine Internet Archive (archive.org) on February 12, 2018" (the "Case Study"), and Exhibit D, an "Overview of Mayo Clinic List Properties" dated from January 2014. (*Id.* at Exs. C and D.) The Case

---

[2] While Mr. Schreiber alleges that the "Source: Direct Mail" notation on Exhibit A and "Source: Direct Mail Sold" on Exhibit B demonstrate that the information came from Mayo (FAC ¶ 9), in fact, those notations merely mean that the individual responded to a direct mail promotion—not the source of the data.

Study states that Mayo has been an "RMI client since 2005," that from 2005-2018, RMI managed various "datacards" and "brokered list rentals" for Mayo, and set forth RMI's activities in the years following the 2010 discontinuation of a Mayo publication not at issue in this case. (*Id.* ¶¶ 5-6 and Ex. C.) Exhibit D allegedly advertises "the availability of various [Mayo] customer lists for rental and exchange." (*Id.* ¶ 7.) Notably, neither Exhibit C nor D reference any actions or conduct taken in 2016. Nevertheless, the FAC summarily concludes without reference to any facts that as a result of representations on the RMI website, Mayo "necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to RMI on at least as frequently as a monthly basis over the same time period."[3] (*Id.* ¶ 6.)

Third, the FAC points to a Mayo privacy policy in effect on July 10, 2016, which Mr. Schreiber claims "admitted that [Mayo] discloses all of its subscribers' Personal Reading Information to third parties." (*Id.* at ¶ 8 and Ex. E.) The Privacy Policy by its own language refers to HealthLetter.MayoClinic.com, and data collected through its web site. (Ex. E.) There are no allegations in the Complaint that Mr. Schreiber was a user of the referenced website.

In addition to the flaws identified above, none of the "documented evidence" Mr. Schreiber pointed to in his original Complaint or cites now in the FAC support the conclusion that Mr. Schreiber's data was available for sale during the relevant time period,

---

[3] The FAC also alleges—but only upon "information and belief"—that Mayo was contractually required to transmit all of its subscriber data to RMI. (FAC ¶ 5.)

or that any sale of his information actually occurred during the 2016 period. In fact, like the original Complaint, the FAC does not allege <u>any</u> facts connecting the data allegedly advertised (by third parties or Mayo) to a sale or disclosure of data by Mayo. With respect to the alleged sale of Mr. Schreiber's data, the FAC alleges that at some unidentified time prior to July 31, 2016, Mr. Schreiber was a subscriber to *Mayo Clinic Health Letter*. (FAC ¶ 18.) It does not allege when he was a subscriber, when he claims his data was sold by Mayo in violation of the statute, or who it was sold to. The only harm he alleges is that as a result of the alleged disclosures "during the relevant pre-July 31, 2016 time period, [he] saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Mayo Clinic Health Letter* over the same time period." (*Id.* ¶ 11.)

## **LEGAL STANDARD**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) ("[F]actual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show <u>entitlement</u> to relief.") (emphasis in original).

A complaint "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading that offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement" does not suffice. *Id.* (citations and quotations omitted); *see also Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 550 (6th Cir. 2020) (noting that a court need not accept as true conclusory allegations, legal conclusions, or unwarranted factual inferences); *Lindke v. Tomlinson,* 31 F.4th 487, 496 (6th Cir. 2022) (affirming dismissal where complaint contained "allegations [that] are purely conclusory" and did not "factually describe the actions [the defendant] took" in violation of the law).

## ARGUMENT

**I. THE COMPLAINT MUST BE DISMISSED BECAUSE IT DOES NOT STATE A CLAIM FOR VIOLATION OF THE PPPA AGAINST MAYO THAT IS PLAUSIBLE ON ITS FACE.**

Under the pre-amendment version of the PPPA applicable here:

> a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

Mich. Comp. Laws § 445.1712 (1989).

Thus, to prevail on his claim, Mr. Schreiber must allege facts that, if proved, plausibly demonstrate that: (1) Mayo disclosed protected information during the relevant pre-July 31, 2016 time period; and (2) the information disclosed identified Mr. Schreiber to the party receiving that information. *Id.*

Here, Mr. Schreiber has no direct evidence of an alleged violation. Instead, he relies on naked assertions devoid of facts, none of which is sufficient to cross the line between possible to plausible, which is required under Sixth Circuit precedent to state a claim. Because Mr. Schreiber has not plausibly alleged facts showing entitlement to relief based on these elements, the FAC must be dismissed.

### A. Mr. Schreiber Has Not Plausibly Alleged that Mayo Disclosed Protected Information during the Relevant Time Period.

To sustain a claim under the PPPA, a plaintiff must establish that the named defendant engaged in the wrongful conduct during the relevant time period. *Nashel*, 2022 WL 6775657, at *5. Mr. Schreiber concedes that the statute of limitations narrows his claim to the "relevant pre-July 31, 2016 time period"—a total of approximately six weeks from June 17, 2016 to July 30, 2016. Therefore, if Mr. Schreiber cannot establish that Mayo disclosed his data to a third party during this window, he cannot sustain a claim. *See* Mich. Comp. Laws § 445.1712 (1989).

Here, the only "facts" Mr. Schreiber musters in his FAC are speculative at best: (1) third party "data cards" from 2022 and 2006, years before and after the relevant 2016 period; (2) a version of Mayo's privacy policy from 2013 applicable to its website which states that Mayo may disclose data; and (3) materials from RMI reflecting actions it took

before 2016 and a client relationship between RMI and Mayo. In *Nashel,* the plaintiff's Complaint[4] cited nearly identical information: third-party data cards, the defendant's privacy policy, and a case study about a third party renting the defendant's subscriber list. *Id.* at *4. The Court held that the plaintiff's allegations, "even in light of that evidence, fail to clear the plausibility threshold." *Id.* This Court should reach the same conclusion here.

1. Data Cards

Examining the data cards presented in the *Nashel* case, Judge Murphy held that they were not sufficient to plausibly state a claim for relief for two reasons. First, Judge Murphy held that because they were not from the relevant time period, they "create[] only suspicion as to whether [the New York Times] violated the PPPA." *Id.* Specifically, the data cards used by Plaintiff were posted "years before" the relevant period, and included subscription counts that pre-dated the relevant time period. *Id.* Judge Murphy rejected the plaintiff's attempt to use conclusory allegations of "systemic" practices to connect this stale evidence to conduct in 2016, holding such a "proposed cure for the timing issue thus relied on a legal-conclusion inference: that Defendants systematically violated the PPPA from 2007 onward." *Id.* at *5. Because such legal conclusions need not be presumed as true, Judge Murphy properly held that the outdated "data cards make the complaint's allegations merely possible rather than plausible" and were not sufficient to sustain a claim. *Id.*

---

[4] Plaintiffs in *Nashel* are represented by the same counsel as Mr. Schreiber.

Second, Judge Murphy held that although the data cards "appeared to claim access to the private reading information of over a million active United States *The New York Times* subscribers," they suffered from a "gaping omission"—"nothing on the data cards explains how the list brokers received [the New York Times'] subscription list." *Id.* Therefore, the data cards failed to support the critical element of the plaintiff's case: that the New York Times violated the statute. *Id.* Judge Murphy rejected counsel's attempt to fill this gap by arguing that the data "necessarily originated" from the New York Times, holding that such a conclusion was a "large inferential leap" when the data card "only indirectly aimed blame at [the New York Times]." *Id.* Because the data card "failed to create a reasonable inference of [the New York Times'] culpability" and courts cannot "infer into existence the central element of a PPPA claim," Judge Murphy rejected the data card as insufficient under Rule 12(b)(6).[5] *Id.*

Here, Mr. Schreiber's reliance on "data cards" does not plausibly allege a claim for violation of the PPPA for the same reasons. First, the data cards attached as Exhibit A and B to the FAC are not from the relevant time period (2016), but rather are from 2022 and 2006, respectively—several years before and after the alleged conduct. Any allegation that the conduct remained ongoing through 2016 is merely a legal conclusion that need not be presumed as true. Second, the data cards suffer the same "gaping omission" as in *Nashel*:

---

[5] Judge Murphy is not the only federal judge to conclude that Plaintiff's counsel's boilerplate allegations were not sufficient on a motion to dismiss. In *Wheaton v. Apple Inc.*, the Northern District of California dismissed a complaint citing the same type of "data card" because nothing established that the advertisement included names and addresses, or other personal identifying information provided by the defendant (Apple). *Wheaton v. Apple Inc.*, No. C 19-02883, 2019 WL 5536214, at *4 (N.D. Cal. Oct. 25, 2019).

they do not identify the source of any information purportedly being made available by the third parties. While Mr. Schreiber alleges that the "Source: Direct Mail" notation on Exhibit A and "Source: Direct Mail Sold" notation on Exhibit B mean the data came from Mayo, such allegation is not supported. (FAC ¶ 9.)

Because the data cards cited by the FAC are substantially the same—and suffer the same defect as—the data cards cited in the *Nashel* case, they fail to plausibly support Mr. Schreiber's allegations of actionable conduct by Mayo.

### 2. Privacy Policy

Plaintiff's reliance on Mayo's privacy policy is similarly unavailing, as Judge Murphy also recognized in *Nashel*. There, the cited privacy policy stated that the defendant "may" exchange or rent name and mailing address—not that the defendant "will" do so. *Id.* Judge Murphy noted that such language was not proof of a statutory violation, writing "[t]he distinction matters. The policy, not moored by a time constraint, shows only that [the New York Times] might disclose information in the future, not that any information was plausibly disclosed." *Id.*

Similarly, here, the privacy policy attached as Exhibit E to the FAC does not affirmatively state that Mayo has or will disclose all of its subscriber data, or did so during the narrow window at issue here. To begin, the privacy policy merely states that Mayo "regularly share[s] our postal mailing list with other organizations." (FAC Ex. E.) That is not an admission that Mayo did share information during the relevant period. Indeed, the Privacy Policy states that it was "updated July 13, 2013"—three years before the relevant time period. While Plaintiff alleges that the website was still posted in July 2016, that,

alone, is too tenuous a connection to demonstrate an actual statutory violation during the narrow six-week window at issue.

Moreover, the privacy policy plainly applies only to HealthLetter.MayoClinic.com and information provided through that website. (*Id.*) There is no allegation in the FAC that Mr. Schreiber or any member of the putative class used this website in connection with their subscription, or that such policy applied to them at all. Accordingly, the privacy policy is nothing but a red herring, unrelated and untethered to the conduct alleged in the FAC.

3. RMI Materials

Finally, the FAC relies on allegations regarding Mayo's purported relationship with RMI, including Exhibits C and D, which are printouts from the RMI website. Exhibit C is a "Case Study" purporting to advertise RMI's success, and Exhibit D is an "Overview of Mayo Clinic List Properties." All of the allegations regarding RMI suffer from the same fatal flaws as the information put forward in the *Nashel* complaint.

First, Exhibits C and D have the same timing problem as the data cards and other materials cited in the *Nashel* Complaint. Exhibit C, the Case Study, discusses Mayo's decision to end publication of the Women's HealthSource title (a publication that is not at issue in this case) in 2010, and RMI's activities related to the same in the years that followed, specifically up to and through 2013. (FAC Ex. C.) Although the FAC alleges that Exhibit C was posted on the RMI website in 2018, that says nothing about whether any activities were undertaken in the relevant 2016 time period. Similarly, the FAC alleges that Exhibit D was posted in 2014, and there is nothing on Exhibit D to connect it to conduct

in 2016. Any allegation or inference that conduct from 2013 or 2014 continued through 2016 is nothing but a legal conclusion that, as Judge Murphy recognized, is not sufficient to plausibly state a claim in this case. *See Nashel*, 2022 WL 6775657, at *5 (holding that allegations regarding a 2020 case study purporting to relate to a sale of data by the New York Times "misses the mark on timing").

Second, the allegation that Mayo and RMI had a relationship from 2005-2018 fares no better than the data card or other allegations. Mr. Schreiber's argument appears to be that because RMI claims that Mayo was a client since 2005, Mayo <u>necessarily</u> disclosed information regarding him and its subscribers on an ongoing and continual basis. (FAC ¶ 6.) Even more problematic, allegations regarding Mayo's alleged contractual obligations with RMI are not even alleged properly, but rather are based on "information and belief"—suggesting that Mr. Schreiber has little if any factual basis in support. (FAC ¶ 6.) Regardless, such allegations are nothing but legal conclusions, and require the same improper "inferential leap" rejected by Judge Murphy in *Nashel*. *See Nashel*, 2022 WL 6775657, at *5 ("[T]he Court need not infer into existence the central element of a PPPA claim—that Defendant was the culpable actor. In the end, Plaintiffs' evidence only indirectly aimed blame at Defendant, but the indirect evidence failed to create a reasonable inference of Defendant's culpability.").

As Judge Murphy noted in *Nashel*, while such allegations may make the alleged violation of the statute possible, they do not cross the threshold into plausibility. Accordingly, for the same reasons, the Court should reject Mr. Schreiber's argument here.

### B. Mr. Schreiber Has Not Plausibly Alleged the Disclosure of His Information.

To sustain a claim under the PPPA, a plaintiff must also demonstrate that his or her own protected information was disclosed within the relevant time period. Mich. Comp. Laws § 445.1712 (1989). This requires allegations that Mr. Schreiber's data was actually disclosed during that window—allegations that are conspicuously absent from the FAC.

As an initial matter, Mr. Schreiber has not alleged that his personal information was actually available through any data cards allegedly available during the relevant time period in 2016, or made available through RMI. Mr. Schreiber also has not made any factual allegations that his personal data was in fact disclosed as a result of the alleged data cards or through any other means. Indeed, an allegation that data was advertised as available for sale falls far short of an allegation that his specific data was actually disclosed during the relevant time period.

Faced with the reality that he has no factual evidence of a disclosure, Mr. Schreiber attempts to buttress his claim by alleging that he saw a "dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Mayo Clinic Health Letter* over the same time period [pre-July 2016]." (FAC ¶ 11.) This circumstantial allegation is not sufficient to establish that his data was disclosed during the relevant time period. It is important to remember the window of conduct at issue in this case is relatively narrow—a period of just six weeks. Because the FAC does not allege that Mr. Schreiber's data was sold, when his data was allegedly sold, or who it was sold to or by, a vague "dramatic uptick" of junk mail during the relevant time period is not evidence of any claim against

Mayo. Indeed, the FAC does not plausibly explain how a sale of Mr. Schreiber's data at some unidentified point between June 17, 2016 through July 30, 2016 (the relevant time period) would have resulted in a "dramatic uptick" in junk mail from the entity or person to whom his information was allegedly sold in such a short window of time.

Simply put, Mr. Schreiber has no factual support for his allegation that his data was disclosed by Mayo during the relevant time period, let alone support that is sufficient to plausibly state a claim for relief. Accordingly, the FAC should be dismissed.

## CONCLUSION

For the reasons set forth above, Mayo respectfully requests that the Court grant its motion and dismiss the First Amended Complaint in its entirety.

Dated: January 17, 2023

By:/s/ Christopher F. Allen

**MCDONALD HOPKINS PLC**

Michael G. Latiff (P51263)
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI 48304
(248) 646-5070
mlatiff@mcdonaldhopkins.com

**MCDONALD HOPKINS LLC**

Christopher F. Allen
(Admitted USDC-MIWD 7/28/2022)
300 N. LaSalle, Suite 1400
Chicago, IL 60654
(312) 280-0111
callen@mcdonaldhopkins.com

**FREDRIKSON & BYRON, P.A.**

Gregory E. Karpenko (#0286473)
(*application for admission pending*)
Anupama D. Sreekanth (#0393417)
(*application for admission pending*)
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone: 612.492.7000
Fax:  612.492.7077
gkarpenko@fredlaw.com
asreekanth@fredlaw.com

***Attorneys for Defendant***