# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEFFREY SCHREIBER, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, <br><br> Defendant. | Case No. 2:22-cv-00188-HYJ-RSK <br><br> Hon. Hala Y. Jarbou <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

## STATEMENT OF ISSUES PRESENTED

1.      Are the First Amended Class Action Complaint's factual allegations that Defendant, during the relevant pre-July 31, 2016 time period, disclosed "Plaintiff's Private Reading Information to data aggregators, data appenders, and/or data cooperatives," as well as "rented or exchanged mailing lists containing Plaintiff's Private Reading Information to third parties seeking to contact [Defendant's] subscribers, without first obtaining the requisite written consent from Plaintiff" (*see* First Amended Class Action Complaint (ECF No. 19) at ¶ 18) – allegations which are bolstered by screenshots of and citations to Defendant's data card, online material detailing how its lists are enhanced and used by marketers and providing additional details about the various customer lists it offers, and its privacy policy in which it admits to disclosing its customers' Private Reading Information – sufficient to plausibly suggest an entitlement to relief under the version of Michigan's Preservation of Personal Privacy Act in effect through July 30, 2016?

**Plaintiff's Answer: Yes.**

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

M.C.L. § 600.5813

Fed. R. Civ. P. 8

*Horton v. GameStop Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018)

*Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023)

*Krassick v. Archaeological Inst. of Am.*, 2022 WL 2071730 (W.D. Mich. June 9, 2022)

*Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022)

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016)

Mich. Executive Order 2020-58

Mich. Executive Order 2020-122

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED..................................................... i

CONTROLLING AND MOST APPROPRIATE AUTHORITIES........................ ii

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ..............................................................................1

THE PPPA ......................................................................................3

FACTUAL ALLEGATIONS OF THE COMPLAINT ............................................4

ARGUMENT ...................................................................................9

    I.    The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private
Reading Information in Violation of the PPPA Between June 18, 2016 and
July 30, 2016 .............................................................................9

CONCLUSION ...............................................................................30

## TABLE OF AUTHORITIES

### Cases

*Boelter v. Advance Mag. Publishers Inc.*,
    210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........................................................ 12, 26

*Boelter v. Hearst Commc'ns, Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016) .................................................. 1, 12, 26

*Boelter v. Hearst Commcn's, Inc.*,
    269 F. Supp. 3d 172 (S.D.N.Y. 2017) ..................................................... 10, 27

*Cain v. Redbox Automated Retail, LLC*,
    981 F. Supp. 2d 674 (E.D. Mich. 2013) .............................................................19

*Carter v. DTN Mgmt. Co.*, --- N.W.2d ---,
    2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023) ................................................9

*CHKRS, LLC v. City of Dublin*,
    984 F.3d 483 (6th Cir. 2021) ...............................................................................28

*Coulter-Owens v. Time Inc.*,
    695 F. App'x 117, 121 (6th Cir. 2017) ........................................................ 26, 27

*Doe v. Michigan State Univ.*,
    989 F.3d 418 (6th Cir. 2021) ...............................................................................18

*Foman v. Davis*,
    371 U.S. 178 (1962) .............................................................................................30

*Halaburda v. Bauer Pub. Co.*,
    2013 WL 4012877 (E.D. Mich. Aug. 6, 2013) ...................................................28

*Horton v. GameStop Corp.*,
    380 F. Supp. 3d 679 (W.D. Mich. 2018).................................................... passim

*Krassick v. Archaeological Institute of Am.*,
    2022 WL 2071730 (W.D. Mich. June 9, 2022).......................................... 27, 28

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...............................................................................................1

*Moeller v. Am. Media, Inc.*,
    235 F. Supp. 3d 868 (E.D. Mich. 2017) ...................................................... 12, 26

*Nashel v. The New York Times Co.*,
    2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) ......................................... passim

*Perlin v. Time Inc.*,
    237 F. Supp. 3d 623 (E.D. Mich. 2017) ................................................ 12, 26, 28

*Pratt v. KSE Sportsman Media, Inc.*,
    586 F. Supp. 3d 666 (E.D. Mich. 2022) .................................................. 2, 27, 28

*Wheaton v. Apple Inc.*,
    2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) ............................................ 19, 20

iv

*Wheaton v. Apple Inc.*,
    Case No. 19-cv-02883 (N.D. Cal. Sept. 20, 2019)................................................20
*Zimmerman v. 3M Co.*,
    542 F. Supp. 3d 673 (W.D. Mich. 2021)................................................................10

**Statutes**

H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989)............................1
H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, § 1-5 (Mich. 1988) ...................1, 3
S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. §
    445.1711, *et seq*.)...............................................................................................1

**Other Authorities**

*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B.
    No. 5331, Jan. 20, 1989 ........................................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................... 18, 27, 29
Fed. R. Civ. P. 8 ................................................................................................ passim

Plaintiff Jeffrey Schreiber submits this response in opposition to Defendant's Motion to Dismiss (ECF No. 24) and Brief in Support (ECF No. 25 ("Def.'s Br." or the "Br.")) the First Amended Complaint (ECF No. 19 ("FAC")).

## INTRODUCTION

In this putative consumer class action, Plaintiff alleges that Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without his consent, information that identified him as (*inter alia*) a subscriber to Defendant's *Mayo Clinic Health Letter* publication. On behalf of himself and others similarly situated, Plaintiff seeks to recover $5,000, as provided by the PPPA, for each of Defendant's statutory violations.

Defendant moves to dismiss the FAC on the ground that Plaintiff fails to adequately allege that Defendant disclosed his Private Reading Information to third

---

[1]    The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq*.). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

parties during the relevant time period.[2]

Plaintiff adequately states a claim for violation of the PPPA that accrued between June 18, 2016 and through July 30, 2016. The FAC specifically alleges that, "during the relevant pre-July 31, 2016 time period," Defendant "continuously" and "at least as frequently as once a month," "rent[ed], exchang[ed], or otherwise disclos[ed] all of its customers' Personal Reading Information," to various third parties, including "data aggregators, data appenders, data cooperatives, and list brokers, among others," all without its subscribers' consent. And the FAC shoves these allegations across the line of plausibility by attaching a screenshot depicting Defendant's publicly accessible "data card" in existence today, which offers for sale Defendant's customers' Private Reading Information "THROUGH 07/19/2022", by alleging that the same data card also existed throughout the relevant pre-July 31, 2016 time period, while also attaching another copy of Defendant's data card that pre-dates the pre-July 31, 2016 time period, and by providing additional documentation demonstrating that Defendant rented its list continuously throughout

---

[2]    As Defendant effectively concedes in the Motion—not moving to dismiss on statute of limitations grounds—it is well established that "[a] six-year statute of limitations applies to PPPA claims." *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 673 (E.D. Mich. 2022). Moreover, that six-year period was tolled for 101 days pursuant to the COVID-19 Orders, thus rendering any disclosures of Plaintiff's personal information that occurred between June 18, 2016 (six years plus 101 days before the date on which this action was initiated) and July 30, 2016 (the last date that the unamended version of the PPPA that Plaintiff invokes in this case was in effect) actionable in this case.

the relevant pre-July 31, 2016 time period.

Additionally, the FAC cites to and attaches as exhibits a publicly available copy of Defendant's privacy policy and other documentation from before or within the relevant pre-July 31, 2016 time period (in which the company also admits to, or other parties admit to being part of, Defendant disclosing its customers' Private Reading Information), many of which were cached by and located in the archives of the Wayback Machine Internet Archive (archive.org). Moreover, the FAC alleges that, "[a]s a result of [Defendant's practices of] disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox . . . over the same time period." Taken together, these factual allegations – which are well-pled and must be accepted as true at this stage of the proceedings – easily state a claim for relief under the PPPA.

The FAC states a claim for relief, and the Motion should be denied.

## THE PPPA

In 1988, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials" by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West). Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any

3

> person, other than the customer, a record or information
> concerning the purchase . . . of those materials by a
> customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

Michigan's passage of the PPPA established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989. *See* FAC, Ex. F.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

Defendant maintains a vast digital database comprised of all its customers' Private Reading Information. *Id.* ¶ 50. Since at least as far back as 2005 through the present, including for the entire pre-July 31, 2016 time period, Defendant continuously transmitted its entire database of its customers' Private Reading Information to data appenders and aggregators at least as frequently as once a month, as well as to other third party renters and exchangers on a regular basis over the same time period. *Id.* ¶¶ 1, 3, 5, 6, 10, 14, & *id.*, Exs. A-C.

Indeed, over that period of time, Defendant disclosed Plaintiff's and all of its other subscribers' Private Reading Information in at least three ways. *Id.* ¶¶ 1, 5, 6, 8, 10, 14, 69. First, Defendant disclosed mailing lists containing Plaintiff's (along with all its other subscribers') Private Reading Information to data aggregators and

4

data appenders, who then supplemented the mailing lists with additional sensitive

information from their own databases before sending the mailing lists back to

Defendant. *Id.* ¶¶ 50, 70; *see also id.* ¶ 5-7 & *id.*, Exs. C, D.[3] Second, Defendant

---

[3]     And RMI Direct Marketing ("RMI") states that Defendant "has been 'an RMI client since 2005", and indicates that, between 2005 and 2018, RMI managed [Defendant's] 'datacards' and brokered list rentals, 'increased [Defendant]'s multichannel marketing efforts', 'increased tests on [Defendant]'s mature list rental file', and, through its list rental efforts on [Defendant]'s behalf, was overall 'able to provide greater value per name' on [Defendant]'s subscriber list for Mayo Clinic year over year." FAC ¶ 5 (citing to Ex. C to FAC) (cleaned up). Moreover, although Defendant attempts to liken this documentation to a case study exhibit in *Nashel*, Br. at 14, PageID.1169, that case cited to a discreet usage of defendant's list. While the article cited in the FAC here necessarily entails continued usage as it describes providing greater value *year over year* – which makes it clear that the timeframe discussed is being compared to previous usage. Further, RMI also added four datacards to the marketplace for Defendant, which RMI had "enhanced" on Defendant's behalf – i.e., appended additional information about each of Defendant's customers to enhance the value of their Personal Reading Information, enabling Defendant to then sell, rent, exchange, and otherwise disclose this information to third party renters and others for more money. *Id.* ¶ 6.

RMI's clients, such as Defendant, used RMI's services during the relevant pre-July 31, 2016 time period, by transmitting its entire subscriber files to RMI, who in turn "appends" additional demographic and personal data about each subscriber to the file, thereby "enhancing" it (i.e., making it more valuable, and allowing the publisher to rent its lists to third parties for more money and to exchange its lists to other third parties on more favorable terms), and also provides the Defendant with the Personal Reading Information of other individuals who are not existing subscribers to its publications but who fit certain pre-determined criteria that render them likely to be interested in purchasing subscriptions to its publications, i.e., "prospects" to whom the publisher then markets its publications. *Id.*

Throughout the relevant pre-July 31, 2016 time period, Defendant (as a data "enhancement" and "prospecting" client of RMI's) was contractually obligated to provide RMI the Personal Reading Information of all of the subscribers (as well as all of the recently expired subscribers) to its Mayo Clinic Health Letter publication, on a periodic and regular basis (at least as frequently as once a month), which RMI then used to facilitate its list enhancement and prospecting services. *Id.* Thus,

5

disclosed mailing lists containing Plaintiff's (along with all its other subscribers')
Private Reading Information to data cooperatives, who in turn gave Defendant
access to their own mailing list databases. *Id.* ¶¶ 52, 71. And third, Defendant rented
and/or exchanged its mailing lists containing Plaintiff's (along with all its other
subscribers') Private Reading Information—enhanced with additional information
from data aggregators and appenders—to third parties, including other consumer-
facing companies, direct-mail advertisers, and organizations soliciting monetary
contributions, volunteer work, and votes. *Id.* ¶¶ 51, 72. As a result of Defendant's
data compiling and sharing practices, companies can purchase and/or obtain mailing
lists from Defendant that identify its customers by their most intimate details such
as their gender. *Id.* ¶¶ 53, 56. Defendant's disclosures of such sensitive and private
information puts consumers, especially the more vulnerable members of society, at
risk of serious harm from scammers. *Id.* ¶¶ 16, 53.

Defendant did not seek its customers' prior consent, written or otherwise, to
any of these disclosures and its customers remain unaware that their Private Reading
Information and other sensitive information has been rented and exchanged on the
open market. *Id.* ¶ 53.

---

because Defendant was a client of RMI's throughout the relevant pre-July 31, 2016
time period (*see* Ex. C to FAC), Defendant necessarily transmitted all of its
subscribers' Personal Reading Information (including Plaintiff's and all Class
members' Personal Reading Information) to RMI on at least as frequently as a
monthly basis over the same time period. *Id.*

The FAC includes a screenshot of a "data card" titled "MAYO CLINIC HEALTH LETTER Mailing List" – which, as of the filing of this action, was publicly available on list broker NextMark, Inc.'s website. In the data card, Defendant offers to rent or exchange the Private Reading Information of all of its subscribers – with "COUNTS THROUGH 07/19/2022" – to anyone interested in purchasing it. *Id.* ¶ 2, Ex. A.[4] As shown in the screenshot of the data card, the list offered for rental or exchange by Defendant also contains myriad other categories of individualized data and demographic information about each subscriber listed, such as gender – data which is also available for rental or exchange for additional charges. *See id.* ¶¶ 2, 14 & *id.*, Ex. A.

The same or a substantially similar "data card" as the one shown in Ex. A to

---

[4] Defendant says that "Exhibit A did not reflect the source of the information allegedly available, how NextMark obtained the information, or the individuals whose information is advertised." Br. at 3, PageId.1158. But, as argued below, where else is information about Defendant's subscribers to come from if not from Defendant itself? Defendant also argues that Plaintiff's allegation that the information came from Defendant is inaccurate because the "source" notation on the data cards attached in Exs. A and B to the FAC ("Source: Direct Mail" and "Source: Direct Mail Sold") demonstrate that the information came from "individual[s who] responded to a direct mail promotion—not the source of the data." *Id.* at 3 n.2.  *See also* Br. at 12, PageID.1167 (making the same argument). First, and notably though, Defendant never argues that it is not the source of the information. Moreover, Defendant's knowledge of this merely strengthens the plausibility of the allegation that this information emanated from it. And most important, Plaintiff specifically alleges that Defendant *is* and *was* the source of this disclosed data, and the allegations of the FAC concerning Defendant's relationship with data companies, including RMI, plausibly support those allegations.

the FAC, with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, was also publicly advertised by Defendant as far back as the beginning of 2005 and throughout the entire pre-July 31, 2016 time period – thus demonstrating that Defendant was renting, selling, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiff's and all Class members' Private Reading Information) to third parties during the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 2, 3.

Defendant was continuously renting, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiff's and all Class members' Private Reading Information) to third parties during the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 1, 14, 69-81. As a result of Defendant disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox following his purchase of a subscription to *Mayo Clinic Health Letter* over the same time period. *Id.* ¶¶ 1, 11.

By renting, exchanging, or otherwise disclosing the Private Reading Information of Plaintiff and its other Michigan-resident subscribers during the relevant pre-July 31, 2016 time period, Defendant violated the PPPA. *Id.* ¶¶ 12, 81. Plaintiff seeks $5,000.00 for himself and each Class member pursuant to PPPA §

8

5(a) and costs and reasonable attorneys' fees pursuant to PPPA § 5(b). *Id.* ¶ 82.

## ARGUMENT

First, as effectively conceded by Defendant (Br. at p. 2-3 & n.1, PageID.1157-58), a six-year limitation period governs the PPPA claim alleged in the FAC, and the COVID-19 Orders extended the limitation period applicable to Plaintiff's and the Class's claims by 101 days. And with the benefit of such tolling, the FAC plausibly states a claim for relief that accrued during the six-year limitation period applicable to a PPPA claim.[5]

### I.    The FAC Adequately Alleges That Defendant Disclosed Plaintiff's Private Reading Information in Violation of the PPPA Between June 18, 2016 and July 30, 2016

Defendant argues that Plaintiff "cannot establish that [Defendant] disclosed his data to a third party" during the pre-July 31, 2016 time period and that Plaintiff

---

[5]    On January 26, 2023, the Michigan Court of Appeals issued a published decision on a case concerning the effect of the Michigan Supreme Court's COVID-19 emergency administrative orders on determining court filing deadlines. *See Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023) (attached as **Exhibit A** hereto). The Court of Appeals held that the COVID-19 Orders "broadly excluded any day within the state of emergency '*for purposes of determining the deadline* applicable to the commencement of all *civil* and probate case types under MCR 1.108(1)." *Carter*, 2023 WL 439760, at *3 (emphasis in *Carter*) (citing AO 2020-18). As such, any disclosure of Plaintiff's Private Reading Information by Defendant between June 18, 2016 and July 30, 2016 is actionable in this case. *See, e.g.*, *Carter*, 2023 WL 439760, at *3 ("conclud[ing] that plaintiff's complaint was timely filed," explaining: "On March 10, 2020, plaintiff had 10 months left to file her complaint. Accordingly, she had that same amount of time to file beginning on June 20, 2020.").

9

"has no direct evidence of an alleged violation." Br. at 9, PageID.1164. The argument is without merit. The FAC's allegations plausibly demonstrate that Defendant disclosed Plaintiff's Private Reading Information in violation of the PPPA during the relevant pre-July 31, 2016 time period.

Review of the FAC is governed by the liberal Rule 8 pleading standard. Plaintiff is not required to prove his claim with evidence at this time. He must merely allege facts that plausibly suggest Defendant violated the PPPA. *See, e.g.*, *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021).

"The Michigan [PPPA] prohibits a person, and an employee or agent of the person, engaged in the business of selling at retail books or other written materials, from disclosing to any person, other than the customer, a record or information concerning the purchase of those materials by a customer that indicates the identity of the customer." *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 177-78 (S.D.N.Y. 2017) (quoting PPPA § 2) (cleaned up).

The FAC alleges that during the relevant pre-July 31, 2016 time period, Defendant disclosed the Private Reading Information of its Michigan-based subscribers, including Plaintiff and all Class members, to various third parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1-2, 5-6, 9-10, 14, 50-54, 69-81. The FAC alleges that Defendant "continuously engaged" in these practices (disclosing Defendant's entire

database of its customers' Private Reading Information to third parties), "at least as frequently as once a month," for the duration of the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 10, 14. The FAC corroborates these allegations by also alleging facts showing that Defendant's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiff and each Class member) has been advertised by Defendant for rental and exchange on the open market since as far back as 2005 and throughout the relevant pre-July 31, 2016 time-period, *see id.* ¶ 5 & *id.*, Ex. C (showing that Defendant has been a client of RMI Direct Marketing continuously since 2005 and detailing RMI's marketing efforts using Defendant's mature list file); *see also id.* ¶¶ 6, 7 & *id.*, Ex. D (detailing appending and enhancement of Defendant's list and the different lists and variables available for purchase); & *id.* ¶ 8 (concerning admissions in Defendant's privacy policy in effect on July 10, 2016), and that over the same time period Defendant in fact routinely disclosed that entire customer database to various third parties, including data appenders, data aggregators, list brokers, marketing companies, and many others. FAC ¶¶ 1-2, 6, 9-10, 14, 50-54, 69-81. Plaintiff bolsters these factual allegations by including a screenshot of a data card posted on data-broker Nextmark's website that offers renters access to the mailing list titled "MAYO CLINIC HEALTH LETTER Mailing List", which contains the Private Reading Information of all of Defendant's subscribers. *Id.* ¶ 2 & *id.*, Ex. A. This data card

indicates that the data is cumulative of all subscribers, with "COUNTS THROUGH 07/19/2022." *Id.*

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 642 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).

But the FAC does not stop there. The FAC pushes these allegations across the line of plausibility: by alleging that the same or substantially similar data card attached as Ex. A to the FAC also existed throughout the relevant pre-July 31, 2016 time period, providing a screenshot of a prior data card, which similarly offered to provide renters access to Defendant's mailing list, entitled "MAYO CLINIC HEALTH LETTER[,]" *id.* ¶¶ 3-4, & *id.*, Ex. B (with "COUNTS THROUGH 10/31/2006"); by citing to and attaching as exhibits a publicly available copy of Defendant's privacy policy updated before and in-use during the relevant pre-July 31, 2016 time period (in which the company also admits to disclosing its customers' Private Reading Information) and online material from RMI Direct Marketing in which it lauds the performance of and details its marketing efforts on behalf of

Defendant's mailing list; and by also attaching a copy of an overview of the various customer lists of Defendants that are for rent or exchange (many of these exhibits were cached by and located in the archives of the Wayback Machine Internet Archive (archive.org)). FAC ¶¶ 5-8 & *id.*, Exs. C-E. Moreover, the FAC alleges that "[a]s a result of [Defendant's] practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiff saw a dramatic uptick of junk mail in his mailbox . . . over the same time period." FAC ¶ 11; *see also id.* ¶ 1. Taken together, these factual allegations—which are well-pled and must be accepted as true at this stage of the proceedings—more than adequately state a claim for relief under the PPPA.

The Privacy Policy attached to the FAC as Ex. E is a cached copy from the Wayback Machine from July 10, 2016, which means that it was the still-operative Policy in place during the relevant pre-July 31 time period (it contains an updated date of July 13, 2013). FAC ¶ 8 & *id.*, Ex. E. In it, Defendant admits that it has a practice of disclosing all of its subscribers' Personal Reading Information to third parties, including by "stor[ing]" its customers' "personal information" with "a third-party vendor," and by "regularly shar[ing] our postal mailing list with other organizations offering products and services that may be of interest to our

customers." *Id.*, Ex. E.[6] These admissions, squarely from within the relevant pre-July 31, 2016 time period, by themselves are sufficient to render the FAC's

---

[6]    Defendant claims that the Privacy Policy only refers to HealthLetter.MayoClinic.com and data collected through its website, and that there is no allegation that Plaintiff used the website in connection with his subscription. Br. at 6, 13, PageID.1161, 1168. Defendant's argument misses the mark though. The Privacy Policy also states, without any limitation as to what constitutes its mailing list, that it is their *entire* "postal mailing list" that it shares. Moreover, information in the data cards confirm the same.

Defendant also argues that the Privacy Policy attached as Exhibit E to the FAC does not affirmatively state that Mayo has or will disclose all of its subscriber data, or that it did so during the window at issue here, and that the Privacy Policy "merely states that Mayo "'regularly share[s] our postal mailing list with other organizations'" – arguing that "is not an admission that Mayo did share information during the relevant period." Br. at 12, PageID.1167. However, the FAC alleges, and Plaintiff and his counsel know from significant experience litigating these cases, that the above is not the way it works in the data brokerage business. As the FAC alleges, Defendant transmitted its entire customer database to data appenders and aggregators in order for those entities to "enhance" Defendant's data by appending to it additional demographic and personal information about each of its customers, which Defendant could then rent and exchange to other third parties for more money and on more favorable terms, and that such agreements required disclosure on at least as frequently as a monthly basis. *See* FAC ¶¶ 4, 51, 70; *see also id.* ¶ 6 & *id.*, Exs. C, D. And that makes sense, because the data appenders and data aggregators could not possibly have known who Defendant's customers were (for purposes of appending more data about each of them to Defendant's customer database) unless Defendant transmitted to them its customer database that identified each of those customers.

Defendant also argues that the three-year gap between the Privacy Policy's last update and the end of pre-July 31, 2016 is "too tenuous a connection" (Br. at 12-13, PageID.1167-68), but Defendant fails to acknowledge that the version of the Privacy Policy was *cached*, and thus present and still applicable, on July 10, 2016, squarely within the pre-July 31, 2016 period. It is not merely that Plaintiff nakedly alleges as much, rather Plaintiff has attached evidence of its cache date. *See* FAC, Ex. E (The Wayback Machine's URL link for Ex. E includes the precise date for which it was present and thus cached: https://web.archive.org/web/*20160710*—which indicates that it was cached on 2016, July 10th).

disclosure-related allegations plausible.

The recent decision *Nashel v. The New York Times Co.*, 2022 WL 6775657, at *1, 5 (E.D. Mich. Oct. 11, 2022), serving as virtually the entire basis of Defendant's Motion (Br. at 9-14, PageID.1164-69), is readily distinguishable and, in any event, an outlier that was wrongly decided. The plaintiffs in *Nashel* pointed to data cards "published online in 2007 and 2008" to support their allegations that the Defendant disclosed its subscribers' Private Reading Information eight years later during the applicable limitation period—and the court in *Nashel* seized on this "timing issue" in its order granting defendant's motion to dismiss. *See Nashel*, 2022 WL 6775657, at *1, 5. In this case, on the other hand, there is no such "timing issue" because the FAC: (1) attaches a copy of the "MAYO CLINIC HEALTH LETTER Mailing List" offered for sale in 2022 (with "COUNTS THROUGH 07/19/2022"), post-dating the relevant pre-July 31, 2016 time period, FAC ¶ 2 & *id.*, Ex. A; (2) attaches exhibits of articles from prior to and during the relevant pre-July 31, 2016 time period, which make clear that Defendant was continually engaged in the wholesale disclosure of its subscriber database to third party marketers throughout the relevant pre-July 31, 2016 time period, *see* FAC ¶¶ 5-7 & *id.*, Exs. C-D; and (3) attaches a cached copy of Defendant's own Privacy Policy (last updated in 2013) as it existed on July 10, 2016, squarely in the middle of the relevant pre-July 31, 2016 time period in which Defendant admits to engaging in the disclosure practices

15

alleged in the FAC.[7] FAC ¶ 8 & *id.*, Ex. E. These allegations collectively show that

Defendant's practices of systematically disclosing all of its customers' Private

---

[7]      The Wayback Machine Internet Archive (archive.org) has cached copies of webpages on sites across the Internet from various dates on which its "crawlers" were active and were collecting data. *See* "Internet Archive: Web archiving," Wikipedia, available at: https://en.wikipedia.org/wiki/Internet_Archive#Web _archiving (last accessed Nov. 30, 2022) ("The service can be used to see what previous versions of web sites used to look like, to grab original source code from web sites that may no longer be directly available, or to visit web sites that no longer even exist. Not all web sites are available because many web site owners choose to exclude their sites. As with all sites based on data from web crawlers, the Internet Archive misses large areas of the web for a variety of other reasons."). Thus, the fact that cached copies of Defendant's data card are not available from the relevant pre-July 31, 2016 time period in no way indicates that the data card was not publicly accessible on Nextmark's website during the relevant pre-July 31, 2016 time period. As the FAC alleges, the disclosure practices in which Defendant was engaged prior to the relevant pre-July 31, 2016 time period, as evidenced by: the data cards (one from prior to the relevant period and one following it); online articles from RMI stating a continuous relationship with Defendant disclosing its mailing list since 2005 and detailing the various Defendant customer lists for rental and exchange; and the Privacy Policy cited in the FAC—all of these practices which have persisted unabated up through at least July 19, 2022, including for the duration of the relevant pre-July 31, 2016 time period. *See* ¶¶ 2-10, & *id.*, Exs. A-E. *See also* FAC ¶ 3 (alleging that "[t]he same or a substantially similar 'data card' as the one shown above [Ex. A], with the same or similar rates and advertised demographic and personal information about each U.S. based purchaser of a subscription as listed above, has been publicly advertised by [Defendant] as far back as 2005 and was publicly advertised by [Defendant] on a continuous basis between 2005 and the present, including throughout the entire pre-July 31, 2016 time period – thus demonstrating that [Defendant] was renting, selling, exchanging, and otherwise disclosing all of its customers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to third parties during the relevant pre-July 31, 2016 time period.") & *id.* ¶ 13 (alleging that Defendant "continuously engaged in these same practices (disclosing its entire database of its customers' Personal Reading Information to third parties, at least as frequently as once a month) since at least as far back as 2015 through the present, including for the entire pre-July 31, 2016 time period").

Reading Information and other data (to third party data appenders, aggregators, renters, and others) began at least as far back as 2005 and persisted "THROUGH 07/19/2022," and thus were ongoing during the relevant pre-July 31, 2016 time period. FAC ¶¶ 1-2, 5-6, 9-10, 14, 50-54, 69-81 & *id.*, Exs. A-E.[8] Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16 disclosures were unsupported by a data card that post-dated that timeframe, here Plaintiff *has* attached as an exhibit a data card that post-dates the relevant pre-July 31, 2016 timeframe and *has* pled numerous additional facts establishing (and at the very least plausibly suggesting) that Defendant was actively and continuously disclosing Plaintiff's and Class members' (and all of its other customers') Private Reading Information to third parties on a monthly basis between 2005 and 2022 – a period of time which encompasses the entire relevant pre-July 31, 2016 time period.

---

[8]      Put another way, the screenshot of Defendant's data card on Nextmark's website in Ex. A to the FAC establishes that Defendant's mailing list continued to be available online <u>after</u> the relevant pre-July 31, 2016 time period (in addition to Ex. B to the FAC establishing that it was available prior), whereas the screenshots in *Nashel* from 2007 and 2008 showed only that the New York Times mailing lists were available <u>before</u> the relevant pre-July 31, 2016 time period. Data sets comprise information gathered in the past. That is, a 2022 data set concerns actions taken in or prior to 2022—evidenced by the language of the mailing list itself ("COUNTS THROUGH") and as corroborated by numerous factual allegations of the FAC and the exhibits thereto (*see, e.g.*, FAC ¶¶ 1-2, 5-6, 9-10, 14, 50-54, 69-81 & *id.*, Exs. A-E). The same may not be said of the 2007 and 2008 *Nashel* data cards screenshots, all of <u>which pre-dated</u> the relevant pre-July 31, 2016 time period.

Indeed, unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the FAC easily state a claim for violation of the PPPA. Again, the FAC specifically alleges that Defendant disclosed its entire subscriber database, including Plaintiff's and all other Michigan customers' Private Reading Information, to data aggregators and appenders and numerous other third parties, on at least as frequently as a monthly basis, during the relevant pre-July 31, 2016 time period. FAC, ¶ 6. And because the relevant pre-July 31, 2016 time period in this case is greater than a month (specifically, from June 18, 2016 through July 30, 2016), it may reasonably be inferred that Defendant disclosed its subscriber database (comprised of Plaintiff's and all Class members', and all of its other customers', Private Reading Information) at one of those monthly (or more frequent) intervals during that timeframe.

Further, *Nashel* is an outlier in PPPA jurisprudence and Plaintiff firmly believes it was wrongly decided. The decision applied a pleading standard far more stringent than Rule 8 imposes,[9] and required specificity that no PPPA plaintiff could

---

[9]    For one, *Nashel* improperly analyzed the plausibility of *the complaint's allegations*. *See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible"). This was a plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be *accepted as true*, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). *Nashel* also recast allegations that were plainly factual in nature

18

ever satisfy. Every other court that presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as those made by Plaintiff here, has held that these allegations adequately stated a claim under the PPPA—including, most recently, in a well-reasoned, published decision from the Hon. Gordon J. Quist of the Western District of Michigan in *Horton*. *See Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *see also Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (Rosen, J.).

Defendant cites a non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), Br. at 11 n.5, PageID.1166, but it too is readily distinguishable. For one, the FAC here contains many factual allegations concerning disclosures (made by a publisher of written material—pursuant to standard, industry-wide practices—not by a technology company like Apple) that were not alleged in *Wheaton*. *See* FAC ¶¶ 37-38. Moreover, in *Wheaton*, the

_____

(such as, e.g., allegations that defendant systematically disclosed subscriber lists containing the plaintiff's Private Reading Information to specific third parties over a specific period of time) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See Nashel*, 2022 WL 6775657, at *5.

plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied on NextMark data cards advertising the sale of this *sort* of data to bolster those allegations. *Wheaton*, 2019 WL 5536214 at *4. However, the defendant there argued that it was not plausible to infer that Apple was even responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of music files on a phone), is *unlike* the Private Reading Information at issue in a case against a publisher of written material such as here (which is comprised of records concerning a purchase of a healthletter subscription to one of Defendant's publications); the defendant in *Wheaton*, in its motion to dismiss briefing, focused on this distinction, explaining that the information there was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a [periodical] plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, Case No. 19-cv-02883 (N.D. Cal. Sept. 20, 2019) (def.'s reply in support of mot. to dismiss) (attached as **Exhibit B** hereto).

Here, Defendant citing to *Nashel*, argues that Plaintiff does not show that the data card information "'necessarily originated'" from Defendant. Br. at 11, PageID.1166 (citing *Nashel*, 2022 WL 6775657, at *5). Defendant argues that Plaintiff does not show how the list brokers received the information, and that the two data cards, from 2006 and 2022, requires a legal conclusion that this continued

ongoing during that time period. *Id.* First, alone, the 2022 data card is sufficient because, as argued throughout, the data list here is necessarily a collection of subscriber information from the past. Beyond that, Plaintiff ties it together with an earlier data card, a privacy policy during the time period in which Defendant admitted to disclosing all of its subscribers' Personal Reading Information to third parties, and various articles from a marketing company, one describing the availability of various Defendant customer lists for rental and exchange, and another in which it describes how it maintained revenue for Defendant, even quoting James Hale from the Mayo Clinic as saying "We were very impressed with RMI's ability to maintain revenue despite the close of [another newsletter]." FAC, Ex. C.

Defendant argues that the data cards that Plaintiff attaches "do not identify the source of any information purportedly being made available by the third parties," arguing that a gap exists in which Plaintiff cannot conclude that the advertised lists necessarily emanated from Defendant. Br. at 11-12, PageID.1166-67. First, as described above, and as acknowledged by the defendant in *Wheaton*, a customer subscriber list is the precise type of thing that would emanate from the publisher, and Plaintiff has sufficiently alleged as much and passes the required threshold under Rule 8. As noted above, Judge Quist held the same in *Horton*: "Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to

NextMark or other data-mining companies passes the threshold of plausibility." *Horton*, 380 F. Supp. 3d at 682.

Defendant also argues that the version of the Nextmark data card that appears as Ex. A to the FAC does not support Plaintiff's claim because it references subscriber information from 2022 and 2006, but not from the pre-July 31, 2016 time period. Br. at 11, PageID.1167. Defendant is mistaken on multiple accounts regarding the import of the information on the data card.

*First*, contrary to Defendant's assertion, the data card is *cumulative*, displaying "COUNTS THROUGH 07/19/2022." FAC ¶ 2, & *id.*, Ex. A. The current data card, at the very least, plausibly suggests that Defendant sold Plaintiff's and Class members' Private Reading Information to third parties during the relevant pre-July 31, 2016 time period because the FAC alleges, and the Court must accept as true for purposes of deciding the Motion, that the data advertised in the data card attached to the FAC as Ex. A was also advertised on a substantially similar data card that existed during the relevant pre-July 31, 2016 time period, *see* FAC ¶ 2, and that, from at least as early as 2005 and as recently as 2022, Defendant "continuously" transmitted its customers' Private Reading Information to third party data appenders and aggregators (at least once a month) in order to have it enhanced with additional demographic and personal data about each subscriber, which Defendant then made available for rental and exchange – and in fact rented and exchanged it – to numerous

other third parties who were interested in purchasing it over the same time period. FAC ¶¶ 1-2, 5-6, 9-10, 14, 50-54, 69-81; *see also id.*, Exs. A-E. Further, as stated above, Plaintiff attached a 2006 data card to the FAC and provided information and support concerning Defendant's systematic and continuous practices of renting and exchanging its list from 2006-2022. *See id.* ¶¶ 2-7, Exs. A-E.

All of these allegations are further bolstered by Defendant's own privacy policy in effect *during* the relevant pre-July 31, 2016 time period, in which Defendant admitted to disclosing its customers' Private Reading Information to third parties, precisely as alleged in the FAC. *See* FAC ¶ 8 (citing *id.*, Ex. E (stating that Defendant discloses all of its subscribers' Personal Reading Information to third parties, including by "stor[ing]" its customers' "personal information" with "a third party vendor," and by "regularly shar[ing] our postal mailing list with other organizations offering products and services that may be of interest to our customers")). Defendant glosses over these factual allegations and the accompanying exhibits in an ill-guided effort to liken this case to *Nashel*.

And while Defendant questions the source of the information in the data card (Br. at 5, PageID.1160) ("Exhibits A and B also do not reflect the source of the information allegedly available, how NextMark obtained the information, or the individuals whose information is advertised."), the data card itself is titled "***MAYO CLINIC HEALTH LETTER*** Mailing List" *see* FAC ¶ 2 & *id.*, Ex. A (emphasis

added), which more than plausibly establishes that the offered data originated from Defendant. Basic common sense also confirms that Defendant is the only original source of the list containing the names and addresses of **its** subscribers, absent some outside party surreptitiously and wrongly gaining access to the file. *See Horton*, 380 F. Supp. 3d at 682. As the FAC alleges, Nextmark is a list broker which advertises on its website the data cards of various publishers, including Defendant, in order to broker sales of the advertised data on behalf of its clients. Thus, Nextmark brokers sales of Defendant's subscribers' Private Reading Information to third parties on behalf of Defendant. The Nextmark data card is just one example of many types of disclosures made by Defendant during the relevant time period. And Plaintiff has provided information concerning a third party to whom Defendant has regularly and systematically disclosed its customers' Private Reading Information to during the relevant pre-July 31, 2016 time period for both list rental brokerage and data enhancement services – RMI Direct Marketing. FAC ¶ 5, & *id.*, Exs. C and D.

Ultimately, the existence of the data card, together with the admissions in Defendant's privacy policy and the other factual allegations of the FAC, confirm the systematic nature of Defendant's disclosure practices.

Defendant attempts to sweep the allegations and articles concerning Defendant's relationship with RMI (*see* FAC ¶¶ 5-7 & *id.*, Exs. C and D) under the rug by arguing that Ex. C to the FAC "says nothing about whether any activities

were undertaken in the relevant 2016 time period" and that "there is nothing on Exhibit D [to the FAC] to connect it to conduct in 2016." Br. at 13, PageID.1168. But, Plaintiff is not required to prove his claim with evidence at this time. He must merely allege facts that plausibly suggest Defendant violated the PPPA. The data cards, the allegations regarding RMI's marketing relationship with Defendant, and Defendant's own privacy policy do just that.

Defendant argues that although Plaintiff has alleged that Defendant has been an RMI client since 2005 (through at least 2018), this does not mean that Defendant necessarily disclosed information about Plaintiff and its entire mailing list. Br. at 14, PageID.1169. But that is exactly how mailing lists work. As argued above and alleged in Plaintiff's FAC, Defendant's relationship with RMI Direct Marketing is one of the types in which Defendant necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiff's and all Class members' Personal Reading Information) to RMI on at least as frequently as a monthly basis over the same time period. FAC ¶ 6. At the end of the day, Defendant is liable under the PPPA because it disclosed Plaintiff's Private Reading Information to third parties without his consent and Defendant offers no denial of doing the same.

Finally, Defendant argues that a PPPA plaintiff must "demonstrate that his or her own protected information was disclosed within the relevant time period" and that "an allegation that data was advertised as available for sale falls far short of an

allegation that his specific data was actually disclosed during the relevant time period." Br. at 15, PageID.1170. But the FAC specifically alleges that Defendant systemically disclosed *its entire customer database (including Plaintiff's and all Class members' Private Reading Information)* to third parties, including RMI, on a regular basis (at least as frequently as once a month) during the relevant pre-July 31, 2016 time period. Defendant further argues that Plaintiff's claim that he saw a dramatic uptick of junk mail following his purchase of a subscription to Mayo Clinic Health Letter is circumstantial and "not sufficient to *establish* that his data was disclosed during the relevant time period." *Id.* (citing FAC ¶ 11). However, at this stage of pleading, that is all that is required. As noted above, numerous published PPPA cases have held the same: *Horton*, 380 F. Supp. 3d at 682 (allegations of existence of mailing list plus receipt of increased junk mail sufficient); *Perlin*, 237 F. Supp. 3d at 642; *Moeller*, 235 F. Supp. 3d at 873; *Hearst*, 192 F. Supp. 3d at 453; *Boelter*, 210 F. Supp. 3d at 590.

Moreover, recent PPPA decisions in the Article III standing context further confirm that Plaintiff has adequately stated a claim for relief in this case. Pursuant to Sixth Circuit precedent, a plaintiff who adequately alleges a claim for violation of the PPPA has Article III standing to pursue that claim in federal court, because a violation of the PPPA necessarily results in the nonconsensual dissemination of information reflecting a plaintiff's personal reading choices. *See Coulter-Owens v.*

26

*Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017) ("In short, given that the PPPA contains an express private right to sue, it confers statutory standing on a person whose information was disclosed in violation of it. Moreover, the disclosure of that information is a cognizable injury in fact for purposes of Article III standing."). Thus, in applying the Sixth Circuit's controlling decision in *Coulter-Owens,* several courts in other PPPA cases have recently concluded that plaintiffs had Article III standing to pursue PPPA claims in federal court based upon allegations that were found to adequately demonstrate that the plaintiffs' Personal Reading Information had been disclosed to third parties in violation of the statute.[10] The plaintiffs'

---

[10]      *See, e.g.*, *Pratt*, 586 F. Supp. 3d at 676 (stating that "it is well established that a properly alleged PPPA claim confers Article III standing," and concluding that the plaintiffs had Article III standing based upon their allegations, substantially similar to those made here, that the defendant had disclosed their PRI in violation of the statute); *Krassick v. Archaeological Institute of Am.*, 2022 WL 2071730, at *2 (W.D. Mich. June 9, 2022) (explaining that "[f]acial attacks on jurisdiction are reviewed under the same standard as is applied to a Rule 12(b)(6) motion: the Court accepts Krassick's well-pleaded allegations as true and asks whether subject matter jurisdiction exists based on the complaint[,]" and concluding that plaintiff had Article III standing based on her allegations that the defendant had "disclos[ed] [her] private reading information in violation of the PPPA[,]" which "'is a cognizable injury in fact for purposes of Article III standing'") (quoting *Coulter-Owens*, 695 F. App'x at 121); *Kinder*, 2014 WL 4209575, at *3 ("Here, Kinder has alleged that Meredith violated her rights pursuant to the [PP]PA by improperly disclosing and selling her personal information. Taking her allegations as true, as this Court must on a motion to dismiss, the allegations would properly allege a violation of the [PP]PA. Thus, Kinder has both statutory standing pursuant to [PP]PA and Article III standing."); *Boelter*, 269 F. Supp. 3d at 185 ("[E]very court to consider the issue of standing under the [PP]PA has concluded that such a violation constitutes a concrete injury in and of itself."); *Moeller*, 235 F. Supp. 3d at 873 ("In the complaint, plaintiffs allege that defendants violated their privacy rights by disclosing personal-

allegations concerning defendants' disclosures of PRI in the *Pratt*, *Krassick*, *Kinder*, *Boelter*, *Halaburda*, and *Perlin* actions are substantially similar to the allegations made by Plaintiff in this case. Thus, by finding that the plaintiffs adequately demonstrated their Article III standing in the *Pratt*, *Krassick*, *Kinder*, *Boelter*, *Halaburda*, and *Perlin* actions, those courts necessarily found that the plaintiffs' allegations – again, allegations substantially similar to those made by Plaintiff here – plausibly suggested an entitlement to relief, satisfying the pleading standard set forth in Rule 8, as interpreted by the Supreme Court in *Iqbal* and *Twombly*. *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) (explaining that "[s]tanding is necessary for a court's subject-matter jurisdiction, so the court has a duty to raise a standing defect (like any other jurisdictional defect) on its own initiative").

Notably, Defendant does not deny publicly advertising a data card offering to rent and exchange all of its subscribers' Private Reading Information to third parties during the relevant pre-July 31, 2016 time period. Nor does Defendant even deny

reading information to data-mining companies and third-party database cooperatives. . . . And because the alleged violation of the Michigan PPPA here implicates plaintiffs' 'concrete interest' in the nondisclosure of their personal information without their permission, they have adequately pled a concrete injury-in-fact"); *Halaburda v. Bauer Pub. Co.*, 2013 WL 4012877, at \*3-5 (E.D. Mich. Aug. 6, 2013) (disclosure of person's information in violation of the PPPA is a cognizable injury-in-fact and confers Article III standing); *Perlin*, 237 F. Supp. 3d at 627-28 (same).

disclosing Plaintiff's and Class members' Private Reading Information to data appenders and aggregators and all of the various other types of third parties specified in the FAC during the relevant time period via declaration, any statement in its brief, or otherwise. Defendant's attack on the sufficiency of the FAC's allegations is thus an attempt to evade liability under a statute that Defendant itself knows it violated, on the grounds that Plaintiff's allegations do not conclusively prove a violation with hard evidence. That is not the standard that Rule 8 imposes. After accepting the FAC's allegations as true and drawing all reasonable inferences from them in Plaintiff's favor, it would be reversible error to dismiss this case pursuant to Rule 12(b)(6) given Rule 8's low bar.

What Defendant really wants to do is turn the PPPA into a toothless tiger. The crux of this lawsuit is that Defendant *failed to inform* Plaintiff and the proposed Class members that it would disclose their Private Reading Information to others and *failed to obtain their consent* prior to disclosing that information to others. Plaintiff and the Class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, Defendant asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and absolving Defendant of its liability under it in the process.

This Court need not go along. The FAC states a claim, and the Motion should be denied.

## CONCLUSION

For the foregoing reasons, the Motion should be denied.[11]

Dated: February 14, 2023          Respectfully submitted,

                                  */s/ E. Powell Miller*
                                  E. Powell Miller (P39487)
                                  Sharon S. Almonrode (P33938)
                                  THE MILLER LAW FIRM, P.C.
                                  950 W. University Drive, Suite 300
                                  Rochester, MI 48307
                                  Tel: 248-841-2200
                                  epm@millerlawpc.com
                                  ssa@millerlawpc.com

                                  Frank S. Hedin
                                  Arun G. Ravindran
                                  HEDIN HALL LLP
                                  1395 Brickell Avenue, Suite 1140
                                  Miami, Florida 33131
                                  Tel: 305.357.2107
                                  fhedin@hedinhall.com
                                  aravindran@hedinhall.com

                                  Joseph I. Marchese
                                  Philip L. Fraietta
                                  BURSOR & FISHER, P.A.
                                  888 Seventh Avenue
                                  New York, New York 10019

---

[11]     If any part of the FAC is dismissed, Plaintiff respectfully requests leave to amend to afford him an opportunity to cure any deficiencies in the FAC identified by the Court. "[R]ule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE REGARDING WORD COUNT

Plaintiff, in compliance with L.R. 7.2(b)(i)-(ii), used 8,485 words in Plaintiff's foregoing brief. Microsoft Word for Office 365 Business version 1910 is the word processing software used to generate the word count in the attached brief.

Dated: February 14, 2023            Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com