# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEFFREY SCHREIBER, RICHARD COLONY, KAY VREDEVELD, and MICHAEL SURNOW, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH,<br><br>Defendant. | Case No. 22-cv-00188-HYJ-RSK<br><br>Hon. Hala Y. Jarbou<br><br>Mag. Judge Ray S. Kent |

## DECLARATION OF FRANK S. HEDIN IN
## SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR
## <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

I, Frank S. Hedin declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and based on my own personal knowledge, that the following statements are true:

1.    I am the founding partner of Hedin LLP and counsel of record for Plaintiffs in this action. I submit this declaration in support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, filed concurrently herewith.

## RELEVANT PPPA LITIGATION EXPERIENCE

2.    My co-counsel and I ("Class Counsel") have been at the forefront of litigation brought under the Michigan PPPA, and thus the results obtained in this case derive from nearly a decade of efforts in this arena.

3.    Beginning in 2015, Class Counsel began investigating and litigating cases against publishers for alleged violations of the Michigan Preservation of Personal Privacy Act (the "PPPA"). *See, e.g.*, *Edwards v. Hearst Commc'ns, Inc.*, No. 15-cv-09279 (S.D.N.Y.). The theory of liability was novel. Although a few other cases had been filed against publishers, none had progressed through class certification or summary judgment.

4.    In 2016, the Michigan legislature amended the PPPA, effective July 31, 2016, to make "actual damages" a prerequisite to stating a claim and remove a prevailing plaintiff's entitlement to statutory damages. Following the effective date of the amendment, and a decision from the Eastern District holding that cases filed on or after July 31, 2016 were subject to the amended version of the statute, the consensus among the plaintiff's bar was that the PPPA was officially dead and, as such, the filing of PPPA cases abruptly came to an end. *See Raden v. Martha Stewart Living OmniMedia, Inc.*, No. 16-12808, 2017 WL 3085371, at *4 (E.D. Mich. July 20, 2017), *reconsideration denied*, No. 16-12808, 2018 WL 460072 (E.D. Mich. Jan. 18, 2018) (case filed July 31, 2016) (last PPPA case filed by any firm other than

Class Counsel, PPPA claim dismissed by court on ground that it was subject to amended version of statute, even though disclosures in question occurred prior to July 31, 2016 effective date of amendment).

5.    Nevertheless, on May 29, 2018, nearly two years after the July 31, 2016 effective date of the Michigan legislature's amendment to the PPPA, my firm initiated *Horton v. GameStop Corp.*, No. 1:18-CV-596 (W.D. Mich.). *Gamestop* was a PPPA class action alleging that the defendant had disclosed the plaintiff's and other Michigan residents' personal reading information between May 29, 2015 and July 31, 2016 (the effective date of an amendment to the PPPA) – in violation of the unamended version of the PPPA that existed up until July 30, 2016. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 681 (W.D. Mich. 2018). The defendant moved to dismiss on the grounds that, *inter alia*, the complaint failed to state a claim for violation of the unamended PPPA because the case had been filed after the amendment's July 31, 2016 effective date. *Gamestop*, 380 F. Supp. 3d at 682. In successfully defeating this motion, my firm obtained the first decision in the country holding that, regardless of the date on which a PPPA action is commenced, "the unamended [PPPA] applies to . . . claims that accrued prior to July 31, 2016, and, consequently, [a] plaintiff [asserting such a claim] [is] not required to plead actual damages." *Gamestop*, 380 F. Supp. 3d at 683. The *Gamestop* decision paved the way for my co-counsel and my successful prosecution of the instant action against Mayo

on behalf of the Settlement Class, because here, as in *Gamestop*, Plaintiffs allege violations of the unamended, pre-July 31, 2016 version of the statute, arising from Defendant's disclosures of personal reading information that pre-dated the statutory amendment's July 31, 2016 effective date. Indeed, invoking the pre-July 31, 2016 version of the statute in this case enabled Plaintiffs to seek statutory damages for the putative class, without showing "actual damages," and thus was instrumental in securing the Settlement presently before the Court.

6.    After obtaining the *Gamestop* decision on September 28, 2018, my firm and co-counsel initiated numerous additional PPPA actions against publishers of written materials through June of 2019 (a "second wave" of PPPA litigation), further refining our skills for prosecuting such claims and, in the process, prevailing on other important legal issues implicated by the statute. *E.g.*, *Kokoszki v. Playboy Enterprises, Inc.*, No. 19-cv-10302-BAF-RSW (E.D. Mich., filed Jan. 30, 2019); *Huguelet, et al. v. Maxim Inc.*, No. 19-cv-4452-ALC (S.D.N.Y., filed May 15, 2019); *Chelone, et al. v. America's Test Kitchen LP*, No. 2:19-cv-11757-TGB-MKM (E.D. Mich., filed June 19, 2019); *Forton v. TEN: Publishing Media, LLC*, No. 1:19-cv-11814-JEL-PTM (E.D. Mich., filed June 19, 2019); *Lin v. Crain Commc'ns Inc.*, No. 19-cv-11889 (E.D. Mich., filed June 25, 2019).

7.    For example, in *Lin*, my firm brought the first ever PPPA class action against a Michigan-based defendant on behalf of a non-Michigan-resident plaintiff

and a proposed nationwide class. *Lin v. Crain Commc'ns Inc.*, No. 19-11889, 2020 WL 248445, at *4 (E.D. Mich. Jan. 16, 2020). Specifically, the complaint alleged that a Michigan-based company had disclosed, from its headquarters in Michigan, the personal reading information of the plaintiff (a resident of Virginia) and all of its other subscribers nationwide to third parties prior to July 31, 2016, in violation of the unamended version of the PPPA. *Lin*, 2020 WL 248445, at *1. The defendant moved to dismiss on the grounds that the PPPA only protects and is only enforceable by Michigan residents, to the exclusion of out-of-state residents – presenting an issue of first impression concerning the territorial reach of the PPPA. *Lin*, 2020 WL 248445, at *3. We defeated defendant's motion, and in so doing obtained the first decision in the country holding that the PPPA "allow[s] non-Michigan residents to pursue claims against Michigan resident-defendants." *Lin*, 2020 WL 248445, at *4. Although the extraterritoriality issue in *Lin* does not directly bear on the claims alleged in this case, my firm's successful prosecution of the *Lin* action (together with our co-counsel) further cemented our ability to prevail on complex and novel issues under the PPPA and strengthened both our knowledge of the statute and our reputation litigating claims under it.

8.      In this "second wave" of PPPA litigation, which spanned from September 2018 (when *Gamestop* was decided) through the end of July 2019, the consensus across the federal judiciary and the plaintiffs and defense bars alike was

that the statute was governed by a three-year limitation period, and it was thus universally understood at that time that claims for violation of the pre-amended version of the statute would no longer be actionable as of July 31, 2019 (three years after the amendment's effective date). *See Edwards v. Hearst Commc'ns, Inc.*, No. 15-CV-9279 (AT)(JLC), 2016 WL 6651563, at *1 (S.D.N.Y. Nov. 9, 2016) (noting that "a three-year statute of limitations admittedly governs [the plaintiff's PPPA claims").

9.     Nonetheless, after closely reviewing the Sixth Circuit's decision in *Palmer Park Square, LLC v. Scottsdale Insurance Company*, 878 F.3d 530 (6th Cir. 2017), my firm determined that the PPPA is actually subject to the six-year limitation period found in M.C.L. § 5813, rather than the three-year period found in M.C.L. § 5805(2) (which up until that point had been universally applied in every prior PPPA case).

10.     Thus, on June 15, 2021, nearly five years after the effective date of the PPPA's amendment, and after extensive pre-filing investigative work, my firm together with our co-counsel in this case, initiated the action *Pratt v. KSE Sportsman Media, Inc*., No. 21-cv-11404-TLL-PTM (E.D. Mich.), which alleged violations of the pre-amended version of the statute that accrued between June 15, 2015 (*six* years prior to the filing of the action) and July 30, 2016.

11.     After further time-consuming investigative work, the *Pratt* action was

followed by dozens of additional PPPA actions filed by my firm and co-counsel – including the instant matter (discussed further below) – each of which depended on the application of the six-year limitation period. *See, e.g.*, *Owen v. Kalmbach Media Co.*, No. 21-cv-11814-VAR-KGA (E.D. Mich.); *Devroy v. Annie's Publishing, LLC*, No. 21-cv-11815-TGB-EAS (E.D. Mich.); *Krassick v. Archaeological Institute of America*, No. 21-cv-00180-HYJ-RSK (W.D. Mich.).

12.     On November 24, 2021, the defendant in *Pratt* moved to dismiss the complaint on the ground that, *inter alia*, plaintiff's claim was time-barred by section 5805(2)'s three-year limitation period. *See Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 669 (E.D. Mich. 2022). On February 15, 2022, following full briefing on the limitation-period question, the court presiding over *Pratt* issued a published opinion denying defendant's motion to dismiss in full, rejecting defendant's argument that three-three period governs PPPA claims and holding that the six-year period found in section 5813 governs such claims. *Pratt*, 586 F. Supp. 3d at 673 (holding that "[a] six-year statute of limitations applies to PPPA claims").

13.     After the decision in *Pratt*, my firm and our co-counsel briefed and prevailed on the same statute of limitations issue in several of our other PPPA cases filed in this so-called "third wave," in both the Eastern and Western Districts of Michigan. *See, e.g.*, *Krassick v. Archaeological Inst. of Am.*, No. 2:21-CV-180, 2022 WL 2071730, at *5 (W.D. Mich. June 9, 2022); *Hall v. Farm Journal, Inc.*, No. 21-

cv-11811-DML-APP (E.D. Mich.) (April 5, 2022 decision finding the plaintiff's claim to be timely and denying motion to dismiss; June 21, 2022 order denying defendant's motion for reconsideration and reaffirming prior decision on motion to dismiss) (*Hall*, PageID.3669-92).

14.     On the strength of these rulings holding that a six-year limitation period governs PPPA claims, my co-counsel and I successfully settled, were appointed as Class Counsel in, and obtained final approval of settlements in *Pratt* as well as several other "wave three" PPPA class actions. *See, e.g.*, *Pratt v. KSE Sportsman Media, Inc.*, No. 1:21-cv-11404, 2024 WL 113755 (E.D. Mich. Jan. 10, 2024) (approving $9.5 million class settlement for a settlement class that included 14,503 persons and paid each class member approximately $420); *Loftus v. Outside Integrated Media, LLC*, No. 2:21-cv-11809 (E.D. Mich. Aug. 9, 2022)[1] (approving PPPA class settlement paying roughly $50 per claimant); *Kain v. The Economist Newspaper NA, Inc.*, No. 4:21-cv-11807 PageID.1369 (approving PPPA class settlement paying roughly $261 per claimant); *Strano v. Kiplinger Washington Editors, Inc.*, No. 1:21-cv-12987 (E.D. Mich. Oct. 11, 2023) (approving class settlement paying roughly $248 per class member); *Moeller v. The Week*

---

[1]     *See* Aug. 9, 2022 Final Fairness Hearing Transcript at 7:9-8:2 (commending work of counsel and noting that "the class has benefited in a concrete way" from the "very effective work" done by the plaintiff's counsel, "where the lawyers did produce significant results for the class") (PageID.3744-45).

*Publications, Inc.*, No. 1:22-cv-10666 (E.D. Mich. Oct. 11, 2023) (approving class settlement paying roughly $248 per class member).

## THE INSTANT LITIGATION

15.    As an initial matter, prior to initiating the instant action (or any of the other "third wave" PPPA cases), my firm and our co-counsel performed a lengthy, several-months-long factual investigation into Mayo's (and other defendants') subscriber list disclosure practices in effect during the relevant pre-July 31, 2016 time period. This investigative work began in December 2020 when my firm reviewed and analyzed relevant legal authorities addressing Michigan's statutory scheme concerning limitation periods. Due to the confidential nature of Defendant's alleged disclosures, our pre-suit investigation into the facts underlying this case (as well as industry-wide list disclosure practices generally) was extensive, and involved in-depth research into a number of publishing industry practices, including data appending and data cooperatives.

16.    Moreover, the success of this case depended on Class Counsel successfully arguing that the amended version of the PPPA does not apply to claims that accrued prior to July 31, 2016 (even if the action asserting the claims is brought after that date), that a six-year limitation period governs such claims, that the applicable six-year limitation period was tolled for 102 days pursuant to the Michigan Supreme Court's orders issued during the COVID-19 pandemic, and that

the presence of Defendant's data card on a data-brokerage warehouse's website today adequately establishes that Defendant was engaged in the same disclosure practices prior to July 31, 2016.

17.    Prior to initiating this action in particular, my firm and I conducted a comprehensive pre-filing investigation concerning the specific factual and legal issues underlying Plaintiffs' claims. These extensive pre-filing efforts included:

- Researching the nature of Defendant's business, its practices of selling newsletters, consumer-privacy policies, and public statements concerning the same;

- Interviewing numerous individuals in Michigan who subscribed to Defendant's publications prior to July 31, 2016, including about their process of purchasing a subscription and any disclosures they received or agreed to during the purchase process;

- Researching and analyzing Defendant's list rental and other disclosure practices, including years' worth of archived versions of webpages containing statements made by Defendant and its affiliates concerning their data-sharing practices and practices of renting lists of *Mayo Clinic Health Letter* subscribers, as well as historical copies of data cards reflecting such practices that were publicly accessible online prior to July 31, 2016;

- Analyzing versions of Defendant's Privacy Policy, Terms of Service, and other public documents on its websites during the relevant time period;

- Researching the relevant law and assessing the merits of a potential PPPA claim against Defendant and defenses that Defendant might assert thereto;

- Reviewing caselaw and statutes concerning the applicable limitation period for a PPPA claim, analyzing the arguments

regarding a six-year period; and

- Analyzing the arguments for the applicability of COVID-19 tolling pursuant to Michigan Supreme Court's administrative orders issued during the COVID-19 pandemic (the "COVID Orders"), including consulting with appellate lawyers briefing the matter before the Michigan Supreme Court.

18.     As a result of this thorough pre-filing investigation, Class Counsel was able to develop a viable theory of liability for a PPPA claim against Defendant and prepare a thorough Complaint against Defendant, filed September 26, 2022. ECF No. 1.

19.     And prior to Plaintiff Schrieber filing a First Amended Class Action Complaint pursuant to Fed. R. Civ. P. 15(a)(1) on January 3, 2023, Class Counsel conducted an even more comprehensive investigation concerning the specific factual and legal issues underlying Plaintiffs' claims. ECF No. 19. As a result, Plaintiff Schrieber's First Amended Complaint included four additional exhibits, providing further supporting documentation of improper disclosures during the applicable pre-July 31, 2016 time period, and additional allegations describing the implications of the same. *See* ECF No. 19, ¶¶ 3-10, & ECF Nos. 19-3, 19-4, 19-5, 19-6 (Exhibits B-E to the First Amended Complaint).

20.     Thereafter, the Court entered a Case Management Order (ECF No. 23), and the Parties began conducting significant written and document discovery, which included the exchange of thousands of pages of documents and voluminous

electronically stored information, and the issuance of over 30 third-party subpoenas by Plaintiffs.

21.    On January 17, 2023, Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing, *inter alia*, that the First Amended Complaint failed to state a claim upon which relief could be granted. ECF Nos. 24-25.

22.    On July 13, 2023, after full briefing, the Court issued an opinion and order denying Defendant's motion to dismiss in its entirety. ECF Nos. 45-46.

23.    Beyond prevailing on the motion to dismiss, Class Counsel faced multiple layers of factual complexity here, much of which was obscured at the outset due to Defendant's alleged concealment of its practices from consumers.

24.    This required both extensive preliminary investigation into Defendant's business practices, methods of data collection and aggregation, and the nature of its relationships with various third-party data companies, and, additionally, steadfast pursuit of the information needed to prove the alleged disclosures here.

25.    On June 26, 2023, Commerce Register, Inc. ("CRI"), one of the third parties subpoenaed by Plaintiffs, produced a document in response to Plaintiffs' subpoena concerning Defendant's transmission of a subscriber list to The Salvation Army that occurred on or about June 20, 2016, squarely within the relevant time period. Thus, on July 27, 2023, Plaintiff Schreiber filed a Second Amended Complaint, which added Plaintiffs Vredeveld and Colony (persons who appeared on

the list transmitted to The Salvation Army) as plaintiffs and putative class representatives. ECF No. 49.

26.    On August 10, 2023, Defendant filed its Answer to the Second Amended Complaint, which denied the allegations generally and asserted 12 affirmative defenses to liability. ECF No. 50. Defendant made various challenges to the merits of the claims, raised statute of limitations defenses, and were prepared to assert numerous other defenses to the merits and the propriety of class certification, before this Court and the Sixth Circuit if necessary.

27.    On October 10, 2023, SFG, LLC ("SFG"), Mayo's agent and another of the third parties subpoenaed by Plaintiffs, produced materials in response to Plaintiffs' subpoena indicating that SFG transmitted, on Mayo's behalf, a Mayo subscriber list to CRI on June 23, 2016, squarely within the applicable class period. This discovery was spurred by SFG's production to Plaintiffs' counsel of a server log file that reflects the activity on SFG's server housing Mayo's data during the class period. Although Plaintiffs requested a copy of this log file in their subpoena issued to SFG on June 1, 2023, SFG consistently denied being in possession of a such a file for several months, including after multiple meet and confer efforts by Plaintiffs' counsel. In response to these denials, and after numerous meetings and conferrals with SFG's counsel, my firm served a subpoena for inspection of premises on SFG, setting a date for Plaintiffs' counsel and a digital forensics firm selected by

13

Plaintiffs' counsel to inspect the actual server at SFG's headquarters in Big Sandy, Texas to locate the server's log file that reflects the activity on the server during the class period. Shortly thereafter, on October 10, 2023, SFG's counsel notified Plaintiffs' counsel that it had located the log file, which had been in its possession all along, and produced the file to Plaintiffs' counsel. The log file reflects, *inter alia*, a transmission of a Mayo subscriber list (containing the names and addresses of all persons who had purchased *Mayo Clinic Health Letter* subscriptions that were active as of July 18, 2013) to CRI on June 23, 2016. Thus, on February 9, 2024, Plaintiffs Schrieber, Vredeveld, and Colony filed the operative Third Amended Complaint, which added Plaintiff Surnow (who appears on the July 18, 2013 subscriber list) as a plaintiff and putative class representative. ECF No. 65.

28.    From the outset of the case, the Parties engaged in direct communication, and as part of their obligation under Fed. R. Civ. P. 26, discussed the prospect of resolution.

29.    On April 17, 2023, the Parties participated in an early settlement conference before Magistrate Judge Kent in Grand Rapids, which was unsuccessful.

30.    Later on, on October 27, 2023, the Parties participated in a full-day mediation with Judge Rosen in Detroit, during which they made substantial progress but failed to reach a settlement.

31.    Then, on December 11 and 12, 2023, the Parties participated in another

two full-day mediations with Judge Rosen in New York, which ultimately culminated in the preliminarily-approved settlement.

32.    In preparation for each of these sessions of mediation, my co-counsel and I prepared detailed mediation statements outlining the strength of Plaintiffs' case and comparing this matter with other, previously settled PPPA cases against publishers, in order to properly evaluate any potential settlement proposals and structures.

33.    In advance of these mediation sessions, my co-counsel and I also thoroughly reviewed the voluminous discovery produced by Defendant and various third parties, and conducted extensive analysis of the size and parameters of the potential class (which included highly technical work performed by a database management expert hired by Class Counsel) and the strengths and weaknesses of Plaintiffs' case (including, most notably, the applicability of COVID-19 tolling and the pending appeal before the Michigan Supreme Court concerning the same).

34.    In the weeks following the sessions of mediation in New York before Judge Rosen, the Parties negotiated and finalized the Settlement Agreement, attached as Exhibit 1 to the Declaration of E. Powell Miller, conducted a competitive bidding process and selected the now Court-appointed Settlement Administrator –

Kroll Settlement Administration LLC ("Kroll")[2] – and worked together to finalize the Settlement Class List, which included the assistance of Plaintiffs' database management expert.

35.    The Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determine all the contours of the class, and reach a fair and reasonable compromise after negotiating the terms of the Settlement at arm's length and with the assistance of a neutral mediator. My co-counsel and I worked extensively with defense counsel to finalize and memorialize the agreement into a formal Class Action Settlement Agreement, including class notice documents. That process included rounds of revisions.

36.    The resulting $52,500,000 non-reversionary preliminarily-approved Settlement secures the best-ever recovery in a PPPA case, both in terms of absolute dollars and dollars per-class member. Based on the records obtained in discovery, the preliminarily-approved Settlement Class includes 62,746 direct purchasers whose information was included on the following lists obtained in discovery: MAYO_Schreiber_000533 and MAYO_Schreiber_000519. With a $52,500,000 non-reversionary Settlement Fund, each Class Member who does not exclude

---

[2]    Class Counsel conducted a competitive bidding process with the lowest bid being that tendered by Kroll. The bid is for $134,800, and this bid is a not to exceed price.

himself or herself from the Settlement will <u>automatically</u> receive a *pro rata* cash payment of approximately $540.00 to $700.00.

37.    Prior to this settlement, the highest total settlement in a PPPPA case was in *Edwards v. Hearst Communications, Inc.*, No. 15-cv-09279 (S.D.N.Y.), where the parties reached a $50,000,000 settlement on behalf of a settlement class comprised of over 1.9 million persons, and the highest per-class member recovery in a PPPA case was in *Pratt v. KSE Sportsman Media, Inc.*, Case No. 1:21-cv-11404-TLL-PTM (E.D. Mich.), where the Parties reached a $9,500,000 settlement on behalf of a settlement class comprised of 14,503 persons who each received approximately $420. Thus, the preliminarily-approved Settlement is the best of its kind in two respects – both the total amount recovered ($52.5 million), as well as the amount recovered for each Settlement Class member ($540.00 to $700.00, which is approximately 20% greater than the next highest per-class member recovery in a PPPA settlement).

38.    Plaintiffs and Class Counsel recognize that, despite our belief in the strength of Plaintiffs' claims and Plaintiffs' and the Class's ability to ultimately each secure a $5,000 statutory award under the PPPA, the expense, duration, and complexity of protracted litigation would be substantial and the outcome uncertain in light of the significant risks of non-recovery posed by continued litigation.

39.    Indeed, had this litigation continued, Plaintiffs and Settlement Class

members would have faced several significant risks of total non-recovery, both on questions concerning the merits of the claims and the ability of Plaintiffs to certify a class.

40.    In particular, from the outset of the case, as noted above, Plaintiffs and Class Counsel recognized that the case presented a substantial and novel litigation risk pertaining to the applicability of COVID tolling to the statute of limitations. Specifically, at the time of filing, no court had ever considered whether the Michigan Supreme Court's orders tolling the statute of limitations during the early days of the COVID-19 pandemic were applicable to a PPPA case. Moreover, the constitutionality of those orders has been challenged and is currently being addressed by the Michigan Supreme Court. *See Armijo v. Bronson Methodist Hosp.*, 991 N.W.2d 593 (Mich. 2023) (setting briefing schedule and directing the scheduling of oral argument). Because the case was filed more than six years after the alleged unlawful disclosures, if this Court or the Michigan Supreme Court ultimately held that the COVID-19 tolling orders either do not apply to this case or are unconstitutional, the case would have been time-barred and the Settlement Class would have recovered nothing at all. Relying on this six-year period, Class Counsel initially believed that the latest that a suit could reasonably be filed was by July 31, 2022. But, through extensive research and legal analysis, Class Counsel determined that the 101 days of tolling provided by the COVID Orders would allow a suit to be

brought through October 2022. My co-counsel and I have actively consulted with other Michigan litigants who were pursuing this theory, including the appellate counsel in the COVID Orders cases which have now been taken up by the Michigan Supreme Court.

41.     Additionally, absent the Settlement, Defendant (through its highly experienced and skilled attorneys) indicated that it would have defended against Plaintiffs' claims by arguing that the PPPA does not prohibit the disclosure of the magazine subscriptions information at issue (involving agent intermediaries), that Defendant provided appropriate notice of its practices, and that the information provided to CRI via SFG's computer system did not constitute "disclosures" within the meaning of the statute. Defendant would also have mounted a vigorous defense at trial and beyond, including in any appeal from an adverse judgment or an order certifying a class, and that in light of the statutory damages at stake, Defendant would argue – in both the trial and appellate courts – for a reduction of any class-wide damages award on substantive due process grounds.

42.     Following execution of the Settlement Agreement, my co-counsel and I then prepared Plaintiffs' Motion for Preliminary Approval, Fee Petition, and Motion for Final Approval, which is being filed contemporaneously herewith.

## FAIRNESS & ADEQUACY OF THE SETTLEMENT

43.     Plaintiffs and Class Counsel believe that the relief provided by the

settlement weighs heavily in favor of a finding that the settlement is fair, reasonable, and adequate, and well within the range of approval.

44.    In this litigation, each of the Plaintiffs contributed substantial effort to advance the interests of the Settlement Class. Specifically, each of the Plaintiffs worked with Class Counsel to detail their subscription purchase history, including how they subscribed to the publications at issue; to inform Class Counsel that they did not agree in writing or otherwise to allow Defendant to sell or disclose their Personal Reading Information; that they did not receive notice of such disclosures, nor were they aware of them at all. Moreover, each of the Plaintiffs worked with Class Counsel to prepare at least one of the pleadings in the case and carefully reviewed them for accuracy and approved each before filing.

45.    Plaintiff Schreiber's involvement was particularly extensive. In addition to providing the assistance detailed above, he initiated the case by filing the initial Complaint, and assisted my firm and my co-counsel in our pre-filing investigation. Plaintiff Schreiber also actively conferred with Plaintiffs' counsel prior to and during the settlement conference before Judge Kent early in the case, in addition to the three sessions of mediation before Judge Rosen that ultimately led to the Settlement.

46.    In addition to providing the assistance detailed above, Plaintiffs Vredeveld and Colony were instrumental in providing my firm and my co-counsel

with information concerning their subscription histories that allowed us to confirm that they were included on the list transmitted to The Salvation Army. These Plaintiffs also assisted in preparing the second amended complaint and reviewing that pleading prior to its filing. Plaintiffs Vredeveld and Colony also actively conferred with Plaintiffs' counsel prior to and during the three sessions of mediation before Judge Rosen that ultimately led to the Settlement.

47.    In addition to providing the assistance detailed above, Plaintiff Surnow, although relatively new to the case, provided valuable information to my firm and my co-counsel concerning his subscription history that allowed us to confirm he had been included on the 2013 subscriber list transmitted to CRI on SFG's server during the class period. He also assisted in preparing the operative third amended complaint and reviewed that pleading prior to its filing. Plaintiff Surnow also actively conferred with Plaintiffs' counsel prior to and during the second and third sessions of mediation before Judge Rosen that ultimately led to the Settlement.

48.    Moreover, all of the Plaintiffs filed this case knowing it would invariably reveal their statutorily-protected status as subscribers to Defendant's publication, and kept in regular contact with Class Counsel, including on matters of strategy, discovery, mediation, and the prospects of settlement.

49.    Plaintiffs also coordinated with Class Counsel to respond to formal discovery, including searching for documents such as records pertaining to their

magazine subscriptions, and were prepared to testify at deposition and trial, if necessary.

50.    I am of the opinion that Plaintiffs' active involvement in this case was critical to its ultimate resolution. They took their role as class representatives seriously, devoting time and effort to protecting the interests of the class. Without their willingness to assume the risks and responsibilities of serving as a class representative, I do not believe such a strong result could have been achieved.

51.    Following this Court's Order requiring supplemental briefing in a similar PPPA case, *Kotila v. Charter Financial Publishing Network, Inc.*, Case No. 1:22-cv-00704 PageID.1707-08, the requested service awards here were reduced with the consent of our clients.

## HEDIN LLP'S EXPERIENCE AND EXPENDITURES

52.    With offices in Miami, Florida and San Francisco, California, Hedin LLP focuses on consumer and data privacy class actions and has successfully prosecuted dozens of such matters in state and federal courts as court-appointed class counsel, including in matters alleging claims for violation of Michigan's Preservation of Personal Privacy Act ("PPPA"). *E.g.*, *Kokoszki v. Playboy Enterprises, Inc.*, No. 19-cv-10302-BAF (E.D. Mich.) (class counsel in action alleging sale of *Playboy* subscribers' personal information in violation of the Michigan PPPA, obtained $3.8 million non-reversionary class settlement); *Rivera et*

*al. v. Google, LLC*, No. 2019-CH-00990 (Cir. Ct. Cook Cnty. Ill., Apr. 5, 2022) (class counsel in action alleging violations of Illinois's Biometric Information Privacy Act ("BIPA"), obtained $100 million non-reversionary class settlement); *Olsen, et al. v. ContextLogic Inc.*, No. 19CH06737 (Cir. Ct. Cook Cnty. Ill., Jan 7, 2020) (class counsel in action alleging violations of the of the federal Telephone Consumer Protection Act ("TCPA"), successfully defeated defendant's motion to compel arbitration and obtained $16 million non-reversionary class settlement); *Donahue v. Everi Payments, Inc., et al.*, No. 2018-CH-15419 (Cook Cnty., Ill. Cir. Ct.) (class counsel in action alleging disclosure of consumers' credit and debit card information on printed transaction receipts in violation of the federal Fair and Accurate Credit Transactions Act, obtained $14 million non-reversionary class settlement); *Owens, et al. v. Bank of America, N.A., et al.*, No. 19-cv-20614-MGC (S.D. Fla.) (class counsel in action alleging the improper assessment of overdraft fees when accounts were not actually overdrawn, obtained $4.95 million class settlement); *Liggio v. Apple Federal Credit Union*, No. 18-cv-1059-LO (E.D. Va.) (class counsel in action alleging the improper assessment of overdraft fees for "non-recurring" debit card transactions misclassified as "recurring" debit card transactions, obtained $2.7 million class settlement). Over the past five years alone, my firm has recovered over $400 million in all-cash relief for the classes we have represented. *See* Firm Resume of Hedin LLP, a true and accurate copy of which is

23

attached hereto as **Exhibit 1**.

53.    Overall, my firm has significant experience litigating class actions of similar size, scope, and complexity as here, regularly engaging in complex litigation involving consumer privacy, including PPPA cases.

I declare under penalty of perjury that the above and foregoing is true and accurate. Executed this 15th day of May 2024 at Miami, Florida.

*/s Frank S. Hedin*
Frank S. Hedin

# Exhibit 1



## FIRM RÉSUMÉ

Based in Miami, Florida, Hedin LLP represents consumers in class actions in state and federal courts nationwide. Our firm prosecutes difficult cases aimed at redressing injuries suffered by large, diverse groups of people.  Over the past five alone, we have recovered hundreds of millions of dollars in relief for consumers and investors and facilitated important changes in business practices across a wide range of industries.

### Representative Matters

Notable examples of our work include:

- *Rivera, et al. v. Google LLC*, Case No. 2019-CH-00990 (Cir. Ct. Cook Cnty.) (class counsel in action alleging defendant's collection of "scans of face geometry" in violation of Illinois's Biometric Information Privacy Act, $100 million settlement)

- *Olsen, et al. v. ContextLogic Inc.,* No. 2019CH06737 (Ill. Cir. Ct. Jan. 7, 2020) (class counsel in action alleging violation of Telephone Consumer Protection Act ("TCPA"), $16 million settlement)

- *In re Maxar Technologies Inc. Shareholder Litigation*, Case No. No. 19CV357070 (Cal. Sup. Ct., Santa Clara Cnty.) (class counsel in class action on behalf of investors, $36.5 million settlement)

- *In re Everi Holdings, Inc. FACTA Litigation*, No. 18CH15419 (Ill. Cir. Ct. Jan. 7, 2020) (class counsel in 14 related actions alleging violations of Fair and Accurate Credit Transactions Act against various casino entities and common payment processor, $14 million global settlement)

- *Owens, et al. v. Bank of America, N.A., et al.*, No. 19-CV-20614-MGC (S.D. Fla.) (class counsel in overdraft fee class action, $4.95 million settlement)

- *Liggio v. Apple Federal Credit Union*, No. 18-cv-1059-LO (E.D. Va.) (class counsel in overdraft fee class action, $2.7 million settlement)

- *Kokoszki v. Playboy Enterpises, Inc.*, No. 19-cv-10302-BAF (E.D. Mich.) (class counsel in action alleging violation of Michigan's Personal Privacy Preservation Act ("PPPA"), $3.8 million settlement)

- *Pratt et al. v. KSE Sportsman Media, Inc.*, No. 21-cv-11404- TLL-PTM (E.D. Mich.) (class counsel in action alleging violation of Michigan's PPPA, $9.5 million settlement)

# HEDIN L.L.P.

- *Chimeno-Buzzi v. Hollister Co.* (S.D. Fla.) (class counsel in action alleging violation of TCPA, $10 million settlement)

- *Farnham v. Caribou Coffee Co., Inc.* (W.D. Wisc.) (class counsel in action alleging violation of TCPA, $8.5 million settlement)